[No. 1,096.]

THE STATE OF NEVADA ex rel. NEVADA ORPHAN ASYLUM v. J. F. HALLOCK, State Controller.

State Controller—Duties of.—It is the duty of the state controller to refuse to draw his warrant for any money that is to be used for unconstitutional purposes.

Section 10 of Article XI. of the Constitution—Meaning of "Sectarian Purposes"—How Ascertained—Religious Sects.—For the purpose of ascertaining the meaning of the words "sectarian purposes" as used in the constitution, the court examined the history of the state, in relation to appropriations, as shown by the statutes and legislative journals: *Held*, that the words were used in the popular sense; that a religious sect is a body or number of persons, united in tenets, but constituting a distinct party by holding doctrines different from those of other sects, or people, and that every sect of that character is sectarian within the meaning of that word as used in the constitution.

Idem—Nevada Orphan Asylum—Sectarian Institution.—Upon a review of the testimony: *Held*, that the Nevada Orphan Asylum of Virginia City is a sectarian institution, and as such is prohibited by the constitution from drawing any money from the state treasury to be used for sectarian purposes.

Idem—Money Used for Sectarian Purposes.—*Held*, that if the money claimed, under the act "for the relief of the several orphan asylums of this state" (stat. 1881, 122), should be given to the Nevada orphan asylum, it would be used for the relief and support of a sectarian institution, and in part, at least, for sectarian purposes, and that it is impossible to separate this use of the money from that which might be used for other purposes that are not forbidden.

Application for mandamus.

The facts are stated in the opinion.

*Lewis & Deal* and *B. C. Whitman*, for Relator:

I. The state, by the act in question, has offered terms to the orphan asylums in this state, upon which they may receive and provide for orphans, regardless of creed or sect. Upon a compliance with those terms on the part of such asylums, and the performance of all the conditions of the act, the state obligates itself to pay the amounts specified in the act, and'has appropriated the necessary funds to make the payments. This is a simple contract, and the petitioner having performed its part, it is the duty of this court to compel the respondent to carry out the contract on the part of the state.

II. The legislature did not impose upon orphan asylums any duty as to the moral and religious training of the orphans provided for. So far as the training of the orphan children as to their duties toward God and toward their fellow-man, the act is silent. That is safely left to the judgment and conscience of the managers of such institutions.

III. The word "sectarian," as used in the constitution, does not prohibit the teaching of any doctrine upon which all Christian denominations agree. So far as the Christian Church is concerned, under the constitution of this state, all denominations of Christians are members of it. They are only called "sectarian" in so far as they differ with each other. As to those general doctrines upon which all agree, they are all orthodox. Christianity is a part of the common law of the state of Nevada, as it is of the United States, in the qualified sense that its divine origin and truth are admitted. (*Vidal* v. *Girard's Ex'rs*, 2 How. 197; Potter's Dwarris, 559; Webster's Works, vol. VI. 175; Story on the Const. sec. 1877.) If the instruction given the Protestant children in religious matters in the Nevada Orphan Asylum is in accordance with those principles in which all Christians believe, how can it be claimed that there has been any violation of the constitution in this respect, the teaching being simply in accordance with the constitution itself?

IV. The religious training occupies but a small portion

of the day. The main purpose of the asylum is to provide for the physical wants of the orphan.

V. Even if the Nevada Orphan Asylum is a sectarian institution, the money asked is not used for sectarian purposes. The money is used to feed the children. It is no more than is sufficient for that purpose, as the testimony shows, and is in fact used for that purpose.

VI. This court can not inquire into the religious belief of the managers of any orphan asylum claiming the benefit of the act of 1881. To do so would be to proscribe citizens on account of their creed. If such inquiry can be made, no orphan asylum could ever derive any benefit from the act except such as should be managed by infidels or persons without any fixed religious belief.

VII. The act being constitutional, it was the duty of the respondent to obey the law and carry it into effect. (Potter's Dwarris on Stats. 202, 203; Sedg. Stat. and Const. Law, 409, 410.)

*M. A. Murphy*, Attorney General, for Respondent:

I. The Nevada Orphan Asylum of Virginia City is a sectarian institution, owned, controlled, and presided over by a religious organization known as the "Sisters of Charity," all of whom must be Catholics. "Religious orders," the technical name for associations of men or women in the Roman Catholic Church, whose members live in common in convents. The common bond of union among all the religious orders and which distinguishes them from other classes of associations, is retirement from the world, celibacy, and their organization by means of solemn vows into communities of an entirely ecclesiastical character. (14 New Amer. Cyclopædia, 22, title "Religious Orders;" Webster's Dictionary, title "Nun.")

II. The Nevada Orphan Asylum of Virginia City and the school known as the St. Mary's School which is attached thereto, and a part thereof, are sectarian, because those under whose control they are, are Catholics, members of a Catholic order organized by a Catholic priest in the year 1655, which order was confirmed and approved in the year

1660 by the pope, who is the head of the Catholic Church, and they have to report to the mother house. (Zell's Cyclopædia, title "Sisters of Charity;" 4 New Amer. Cyclopædia, 722, title Charity, Sisters of.) The asylum and school are Catholic institutions, presided over by Catholics, and in which are taught and preached the tenets and dogmas of the Roman Catholic religion and church, and the preachers of other denominations have never been permitted to preach therein, and the tenets of other religious denominations have never been permitted to be taught therein.

III. Under the provisions of our constitution neither Christianity nor any other system of religion is a part of the law of this state. We have no union of church and state, nor has our government ever been vested with authority to enforce any religious observance simply because it is religion. (Sedg. on Stat. and Const. Law, 512, 570; Cooley's Const. Lim. 471; *Bloom* v. *Richards*, 2 Ohio St. 387; 1 Kent's Com. 633.)

IV. The framers of our constitution understood the word sectarian to mean all religious denominations. (See Debates in Const. Conv. 561, 578. See, also, *People* v. *Board of Education*, 13 Barb. 400; *St. Patrick Orphan Asylum* v. *Board of Education*, 34 How. Pr. 227; *Jenkins* v. *Andover*, 103 Mass. 94.)

By the Court, LEONARD, C. J.:

This is an application for a writ of mandamus to compel respondent to audit an account for one thousand two hundred and seventy-nine dollars and seventy-nine cents, and to issue his warrant on the state treasurer for the same, in favor of petitioner, the Nevada Orphan Asylum, said account having been apportioned and allowed to petitioner by a majority of the board of asylum commissioners, for the support and maintenance of orphans and half orphans, under and in accordance with the provisions of the statute of this state, entitled, "An act to appropriate funds for the relief of the several orphan asylums of this state, approved March 3, 1881." (See Stat. 1881, 122.)

Respondent refused and refuses to audit said account, or

draw his warrant upon the state treasurer therefor, on the ground that the Nevada Orphan Asylum is a sectarian institution; and that under section 10 of article XI. of the constitution of this state, he is forbidden to audit any account or draw any warrant upon the state treasurer, for the support of any institution of a sectarian character. The section of the constitution referred to reads as follows: "Section X. No public funds of any kind or character whatever, state, county, or municipal, shall be used for sectarian purposes."

Respondent admits that the claim of petitioner is valid in every respect, except as above stated, and it is not claimed that the statute referred to is unconstitutional. In short, respondent concedes it to be his duty to audit the account and draw his warrant therefor, if by so doing he would not use the state's money for sectarian purposes; but, on the contrary, he conceives it to be his duty to refuse compliance with petitioner's demand, if, in fact, the Nevada Orphan Asylum is a sectarian institution, notwithstanding the statute.

That the legislature, under the constitution, could not have appropriated moneys for sectarian purposes, is too plain for argument; and it is equally plain that state funds should not, and can not, be used for such purposes in any case, as the statute is written, any more than they could have been so used if the statute had contained a proviso excepting asylums or institutions of a sectarian character. No officer is justified in obeying the letter of a law if in so doing he violates the spirit and letter of the constitution. It was claimed at the oral argument, by counsel for petitioner, that respondent's only power in the premises was to determine whether petitioner is such an asylum as that described in the statute; whether its officers had done the things required of them; whether the board of asylum commissioners had performed their duties, and whether the demand was just as to the amount claimed. It was urged that he had no power to refuse to draw his warrant, although, in fact, by so doing he would be using the funds of the state for sectarian purposes.

As we construe the second brief of counsel for petitioner, this position is abandoned; but whether we are right in this or not, it can not be maintained. The amendment to the constitution above quoted was intended to be self-acting. It requires no legislation to become operative. It is a check upon the financial officers of the state, and the counties and municipalities of the state, and its efficacy is independent of legislative action. The only way to give effect to its provisions is for such officers to refuse to violate its plain commands. (*State ex rel. Salomon & Simpson* v. *Graham,* 23 La. Ann. 407; *Bowie* v. *Lott,* 24 Id. 215; Cooley's Const. Lim. 73.)

The constitutional amendment, adopted subsequent to the enactment of the statute relied on by counsel for petitioner, is controlling upon the point in question, even though the statute itself sustains counsel's position, which we do not now concede. (*Sias* v. *Hallock,* 14 Nev. 332; *State ex rel. Keyser & Elrod* v. *Hallock,* Id. 202; *State ex rel. King* v. *Hallock, ante,* 152.) In those cases we recognized the fact that the controller had power, under the statute, to do what he has done in this case under the amended constitution, but the point now being considered was not made by counsel.

Counsel for petitioner next say that petitioner has performed its part of a contract, and the state should now be required to perform the contract on its part. The constitution, as amended, was in force when the statute was passed, and petitioner is presumed to have had knowledge of its provisions. It knew, also, that it could not receive the benefits and privileges of the statute, if such action would violate the constitution. In fact, if payment of petitioner's claim would be using the state's moneys for sectarian purposes, it had no right to suppose that the statute was intended for its benefit.

We now come to the principal question presented:

Is the Nevada Orphan Asylum a sectarian institution, and would the payment of its claim be using the state's funds for sectarian purposes? We agree with counsel for petitioner that this court should not, and will not, consider whether

the statute is wise or unwise, or whether it will or will not diminish the public revenues, but that it will preserve the constitution.

The amendment to the constitution with which we have to deal was proposed by the legislature of 1877. It was agreed to by a majority of the succeeding legislature, in 1879. It was approved and ratified by the people at the election of 1880, when it became a part of the constitution of the state. When the amendment was proposed and ratified, the constitution made it the duty of the legislature to provide for a uniform system of common schools, by which a school should be established and maintained in each school district at least six months in every year; * * * and that any school district which should allow instruction of a sectarian character therein might be deprived of its portion of the interest of the public school fund during the time of such instruction. (Const. art. XI. sec. 2.) Section 9 of the same article also provided that, "No sectarian instruction shall be imparted or tolerated in any school or university that may be established under this constitution." Plainly, the object of those provisions was to keep all sectarian instruction from the schools. For some reason the people were not satisfied with the constitution as it was. They demanded something more, and they embodied in the fundamental law a prohibition against the use of the funds of the state or of any county or municipality for sectarian purposes. Two legislatures by their acts declared the amendment a wise and needful measure, and the people at the ballot box adopted as their own the judgment of their legislators. Our constitution can be amended only after a long time and much labor. When an amendment is made it is reasonable to conclude that, in the minds of the people, there is good reason for the change; that it is wise to avoid a possible recurrence of evils borne in the past, or the happening of those which threaten them in the future, or, it may be, both. Constitutions, as well as statutes, are to be construed in the light of previous history and surrounding circumstances. (*Kennedy* v. *Gies*, 25 Mich. 83; Story on the Const., vol. 1, sec. 405 a.)

"The object of construction, as applied to a written constitution, is *to give effect to the intent of the people in adopting it.*" (Cooley's Const., Lim. 54.) It is true that, "possible, or even probable meanings, when one is plainly declared in the instrument itself, the courts are not at liberty to search for elsewhere." (Id.) "If, however, a difficulty really exists, which an examination of every part of the instrument does not enable us to remove, there are certain extrinsic aids which may be resorted to, and which are more or less satisfactory in the light they afford. Among these aids is a contemplation of the object to be accomplished, or the mischief designed to be remedied or guarded against, by the clause in which the ambiguity is met with." * * * "The prior state of the law will sometimes furnish the clue to the real meaning of the ambiguous provision, and it is especially important to look into it, if the constitution is the successor of another, and in the particular in question, essential changes have apparently been made." (Id. 65.)

In this case there is, in one sense, no ambiguity. It is plain that no public funds can be used for sectarian purposes; but it is not plain, from the amendment itself, what the people meant by the words "sectarian purposes." With the view of gathering their meaning, their intention in that respect, and of ascertaining whether this case comes within the constitutional prohibition, we shall examine the history of the state in relation to appropriations, as it is shown by the statutes and legislative journals.

And stating first the result of our investigation, we find that, with one exception, petitioner has been, and is, the only applicant for state aid, where the question of sectarianism could have been raised, since the adoption of the constitution.

The exception stated was this: In 1866 a bill was introduced in the assembly, entitled, "An act appropriating money for the benefit of St. Paul's Episcopal Parish School," at Virginia City. The amount asked was ten thousand dollars. That bill was indefinitely postponed. (Assembly Journal, second session, 276.)

At the same session a bill was introduced in the senate, entitled "An act appropriating moneys for the benefit of the orphan asylum, conducted by the Sisters of Charity at Virginia City." The amount mentioned in the bill was ten thousand dollars. This bill passed both houses, but was vetoed by the governor. (Senate Journal, second session, 252.) It was claimed by the friends of the *senate* bill that the *assembly* bill was introduced for the purpose of defeating the senate bill, and the advocates of the latter bill opposed the passage of the other. (Assembly Journal, 246.)

On the thirteenth of February, 1866, Mr. Lockwood, in the senate, moved to refer the senate bill to a committee, with instruction to amend, by inserting a section as follows: "No sectarian instruction shall be imparted or tolerated in any school or university that may be established or maintained under this act." That amendment was voted down. (Senate Journal, 147.)

The senate committee of ways and means of that session, to whom the above bills were referred, reported against their passage, in part for the following reasons: "They ask for the sum of twenty thousand dollars, substantially for the same objects; that is, to enable them to train up children in the tenets or religious belief of the respective churches, without regard to the question of religious opinions of the relatives of such children, which is commendable zeal for the progress of those denominations, as the right training of the children is the best way to build up churches. But if the state contribute twenty thousand dollars towards building up and strengthening those churches, and making provision thus for future increase of Episcopal pastors and laymen and Catholic priests, nuns, and laymen, other denominations, such as Presbyterians, Methodists, Baptists, and Unitarians, will feel equally entitled to similar appropriations; and thus the revenues of the state might be absorbed to such an extent as to endanger its ability to pay its bonds, interest, and other obligations, for which its faith is already pledged, or which may be necessary for ordinary current expenses."

At the next session of the legislature, an appropriation of

five thousand dollars was made "to provide for fostering and supporting the Nevada Orphan Asylum, a duly incorporated institution, located at Virginia City," and the board of county commissioners of any county in the state was authorized and empowered to send to the asylum any white child or children, under twelve years of age, left parentless while residing in the state. (Stat. 1867, 130.)

At the next session, 1869, a similar law was passed, appropriating six thousand dollars. (Stat. 1869, 107.) At the next session, 1871, the sum of five thousand dollars was appropriated for the same purpose. (Stat. 1871, 103.) At the next session, 1873, an appropriation was sought, and a bill introduced in the assembly to obtain it, but at the re- · quest of the sisters in charge, it was withdrawn. (Assembly Journal, sixth session, 225). At the eighth session, 1877, when the amendment to the constitution was proposed, a bill appropriating five thousand dollars was introduced and passed in the senate, but it was defeated in the assembly. (Assembly Journal, eighth session, 244, 327, 330.) At the session of 1879 an appropriation was sought, and a bill therefor introduced, which was laid on the table, where it remained. (Senate Journal, ninth session, 311.) .

This, we think, concludes the history in brief, of appropriations made by the state, on ·behalf of any institutions against which the objection of sectarianism could possibly have been urged, until the passage of the statute under which petitioner claims the amount now demanded. It is proper to state here, that in 1873 "An act for the government of the State Orphans' Home" was passed, the fifth section of which made it the duty of the board of directors to inform the trustees of the Nevada Orphan Asylum that they would receive all orphans in their charge then maintained in any manner by the state, and would bear all the necessary expenses in their removal, at any time when desired by the trustees of said Nevada Orphan Asylum.

A few of the facts above shown will bear repeating. At every session of the legislature from 1866 to 1881, inclusive, with the exception of the session of 1875, petitioner asked for an appropriation from the state. During that time, and

before the amendment was proposed, sixteen thousand dollars were appropriated. At the session of 1877, when the amendment was proposed, an appropriation was asked, but the bill failed to pass. No other institution, save one, of a sectarian character, whether petitioner is so or not, has applied for state aid; and as to that one, the advocates of petitioner's application in the legislature of 1866, charged that its motives were sinister; that its real object in asking an appropriation was to defeat petitioner's application. The friends of petitioner's application in 1866, refused to adopt Mr. Lockwood's amendment that *no sectarian instruction should be imparted or tolerated in school.* If there was no intention of imparting such instruction, it is difficult to perceive what objection could have been made to the amendment offered. It was certainly in keeping with the letter and spirit of the constitution in relation to public schools, and entirely unobjectionable if sectarian instruction was not to be imparted. And one of the sisters in charge testified in this case that, "the same course of treatment has been pursued during the last year as in the years previous thereto." Upon the above facts alone we are strongly impressed with the idea that, in the minds of the people, the use of public funds for the benefit of petitioner and kindred institutions, was an evil which ought to be remedied, and that petitioner's continued applications greatly, if not entirely, impelled the adoption of the constitutional amendment. But we need not rest here. Let us examine the testimony and see where that leads us. There are before us depositions of persons other than the sisters in charge; but we shall confine ourselves to their testimony. They certainly know the facts, and upon their statements alone, outside of what has been already shown, shall it be decided whether or not the Nevada Orphan Asylum is a sectarian institution. It is admitted by the attorney general that petitioner does not make any distinction in its reception of orphans on account of creed or sect, and that it has never made such distinction. It is admitted by counsel for petitioner that the St. Mary's School is a part or branch of the Nevada Orphan Asylum; that it is controlled exclusively by officers of the

latter, who are Sisters of Charity, members of the Roman
Catholic Church, and who can not become sisters unless
they are members of that church. The petitioner is a
branch of the "mother house" at Emmettsburg, Maryland,
and has to report to it. The testimony which we are to
consider shows this: The amount demanded by petitioner
does not exceed the cost of the orphans' living. The books
used at the school are those in common use in public
schools, and the children are taught in the different branches
embraced therein. · They are also taught in music, needle-
work, housekeeping, etc., when it is proper and best to do
so, the principal object being, says sister Frederica, "to
make them good women and good mothers afterwards."

*All the children,* after dressing in the morning, are re-
quired to repair to the washroom, when all kneel down in
their playroom, where prayers are said aloud by one of
them for four or five minutes. This exercise is repeated at
night. These prayers are the Lord's prayer, the angelical
salutation, the apostolic creed, the acts of faith, hope, and
charity, and the prayer for the president. In the act of
faith are these words: "*O my God, I firmly believe all the
sacred truths Thy holy Catholic Church believes and teaches,
because Thou hast revealed them, Who canst neither deceive nor
be deceived.*" Protestant children are not required to say
those prayers, but they must be present, and, "for form's
sake, and the preservation of order, must ·kneel down
during the time occupied in saying them. If objection is
made, they need not kneel, but may sit instead. And, as a
matter of fact, some do object, and sit, rather than kneel
down."

"Only to Catholic children are instructions given in the
doctrines of the Catholic Church," and this is done "at
the request of their friends." "*The Protestant children are
asked to say their prayers in silence to themselves.* If they asked
to do otherwise, they would be permitted to do so, but they
have never asked it."

"According to the regulations of the organization, should
a minister of a denomination other than the Catholic ask to
hold services at the orphan asylum, the children of Catholic

parents would be permitted to attend, *provided that his subject would not be on religious matters.*"

"In speaking of religious services held at the asylum," says Sister Vibianna, "I mean exclusively Catholic services. We could permit other religious services to be held, but we have not children enough. We would permit any minister to come down and see children of his own belief. We would give him a room for the purpose of giving them instruction." Sister Frederica says: "I require all orphans and half orphans to attend morning and evening prayer, unless ordered by friends or parents to the contrary. I do not have passages in the Bible read—but they have catechism for the Catholic children every morning. I do not require all to attend to the exercises when the catechism is read. They are present in the room. Any orphan or half-orphan can read any bible, and pray as they wish—*that is, privately. We do not permit it in the room used for prayer.*" * * *

"In regard to religious instructions, we are guided by the instruction of the orphan's friends. We instruct the Cathlic children in the Catholic faith."

From all the preceding facts it seems to us, that but one conclusion can be arrived at, which is, that the Nevada Orphan Asylum is a sectarian institution. Webster defines sectarian as follows: "Pertaining to a sect or sects; peculiar to a sect; bigotedly attached to the tenets and interests of a denomination." He also defines the word as "one of a party in religion which has separated itself from the established church, or which holds tenets different from those of the prevailing denomination in a kingdom or state," and it was argued by petitioner's counsel that the word was used in this sense in the constitution. We do not think so. It was used in the popular sense. A religious sect is a body or number of persons united in tenets, but constituting a distinct organization or party, by holding sentiments or doctrines different from those of other sects or people. In the sense intended in the constitution, every sect of that character is sectarian, and all members thereof are sectarians. The framers of the constitution undoubtedly considered the Roman Catholic a sectarian church.

(Const. Debates, 568 *et seq.*)   The people understood it in the same sense when they ratified it.

Counsel for petitioner lay great stress upon what are claimed to be the facts; that is to say, that *Protestant* children are taught only those things which are common to all Christian people, and that only the children of *Catholic* parents are taught the principles of the Catholic Church. In the first place, the facts are not so, and in the second place, if they were, the instruction given to the Catholic children would stamp the institution as sectarian.

The facts are, that all exercises of a religious nature are of one kind, exercises appertaining to the Catholic Church, and they are regular, and form as much a part of the daily routine, as does the study of geography or arithmetic. And those exercises, although brief, are such as leave their impress upon the plastic mind of the child.   We refer now to the exercises of a religious nature, in which all take part. The act of faith is repeated by some child, in the presence of all the rest in a kneeling posture, and in doing so he is required to say he believes "all the sacred truths Thy holy Catholic Church believes and teaches, because Thou hast revealed them, Who canst neither deceive nor be deceived." It is idle to say that the kneeling Protestant children are not required to join in those prayers, simply because one child articulates the words for all.   Their very posture is a sufficient answer to the proposition.   And in addition to these general daily exercises, the children of Catholic parents are taught the catechism, which imparts all the fundamental doctrines of the church.

It does not matter that Catholic parents desire their children taught the Catholic doctrines, or that Protestants desire theirs to be instructed in Protestantism.   The constitution prohibits the use of any of the public funds for such purposes, whether parents wish it or not.   If all the children at the asylum were Catholics, and all their parents or friends wished them taught Catholic dogmas, those facts would not make the institution non-sectarian.   *It is what is taught, not who are instructed*, that must determine this question.   If the instruction is of a sectarian character,

the school is sectarian. A church is as much sectarian if every person in attendance is a communicant, as it would be if a part were of one belief and the balance of another. The word "sectarian," in the amendment, is evidently used in the same sense as in the original constitution. It was intended that public funds should not be used, directly or indirectly, for the building up of any sect. And any instruction or exercises which, in common schools, would be of sectarian character, are so at the St. Mary's School. Suppose that, in the public schools of Virginia, the teachers should require all the children, twice each day, to go through the religious exercises of the St. Mary's School, would any one, Protestant or Catholic, hesitate to say that sectarian instruction was being imparted? Would any trustee, regardless of his religious faith, after taking an oath to support, protect, and defend the constitution of the state, dare to say it was not being violated each morning and evening? Would any teacher of the Presbyterian faith be permitted to require the whole school to kneel while one should repeat the Catholic article of faith, after substituting "Presbyterian" for the word "Catholic?"

People of nearly all nationalities and many religious beliefs established our state. They met on common ground, and in the most solemn manner agreed that no sect should be supported or built up by the use of public funds. It is a wise provision and must be upheld.

One other question requires consideration. It is claimed that even if petitioner is a sectarian institution wherein sectarianism is taught, still the money now demanded, if paid, would not be used for sectarian purposes, but for the physical necessities of the orphans, and that it is no more than is required therefor.

It can not be doubted, that the appropriation was intended to be a mere charity. The act is entitled, "An act to appropriate funds for the *relief* of the several orphan asylums of this state." All asylums "established on a self-sustaining basis, where the inmates are required to pay for admission, support, and maintenance therein, and such asylums as are now supported entirely by state aid, shall not

be entitled to the benefits of this act, but only such as are supported and sustained wholly or in part by *charitable* donations." (Stat. 1881, 122.) And it is alleged in the petition that petitioner has been, ever since its organization, and still is, almost entirely supported by contributions of money and other assistance from the charitable.

The seventy-five dollars appropriated for each orphan is a contribution only. Should it be given, it would be used for the relief and support of a sectarian institution, and in part, at least, for sectarian purposes. Should it be admitted that it would be used in part for legitimate purposes, still, it is impossible to separate the legitimate use from that which is forbidden.

Mandamus denied.