The County of Cook

*v.*

The Chicago Industrial School for Girls.

*Filed at Mt. Vernon September 28, 1888.*

1. Sectarian schools—*public aid thereof—constitutional inhibition —whether a school is sectarian.* The fact that an institution of learning teaches the doctrines of a particular church or religious sect, and that all exercises of a religious character are of those of such church, will render the institution sectarian, within the meaning of section 3, of article 8, of the constitution, prohibiting the payment from any public fund of anything in aid of any church or sectarian purpose, although all its pupils may not be instructed in such sectarian doctrines.

2. The refusal to admit a judge of a court having the power to commit dependent girls to an industrial school, into the place where such school is alleged to be kept, unless he should first obtain a permit from a bishop or member of the Roman Catholic church, is a strong circumstance tending to show that such school is controlled by that church.

3. Same — *industrial school for girls* — *delegating its charge to other institutions which are sectarian in character—county aid.* The Chicago Industrial School for Girls, a corporation having no building of its own, placed all girls committed to it by the county court, in the House of the Good Shepherd and St. Joseph's Orphan Asylum,—institutions under two orders of the Roman Catholic church,—which furnished them with clothing and tuition, and received all the pay allowed therefor by the county. It also appeared that the officers of the industrial school were also officers of the two institutions named, and that the doctrines of the Roman Catholic church were taught therein to some of their pupils: *Held,* in a suit by the industrial school against the county, to recover for the price of tuition and clothing of dependent girls committed to its charge and custody, that the money sought to be recovered would be a payment in support of schools controlled by a church, and in aid of a sectarian purpose, and that the action would not lie.

4. The constitutional prohibition against the appropriation of public moneys in aid of any church or sectarian purpose, is not confined to gifts or donations, but applies equally to cases where the payment sought to be made is for services rendered.

5. The design of the act of 1879, relating to industrial schools for girls, is, that each of such schools shall maintain a home or place of its own, and superintend the training of its own scholars. They can not surrender the care and guardianship which they are themselves required to exercise, or intrust to others the instruction and training they are required to give, and if they do, they can not compel the county to pay for the instruction and services furnished by other agencies. They can not delegate the duties imposed on them to other institutions.

6. The county board is required to pay for the tuition, etc., of dependent girls, to the industrial school to which they may in fact be committed. It is not enough that the county judge orders their committal, but they must be actually taken to the school and placed within its buildings. If the county board finds that the girls have never been taken to any industrial school, but that they have been taken to and kept and maintained by other institutions that are not industrial schools, and to whose care and keeping no industrial school has any power to transfer them, it becomes a serious question whether there is any authority for allowing the accounts rendered, and ordering them paid out of the county treasury.

7. Same—*action of the county court—its extent.* The adjudication of the county court involves no other questions than that the girl is dependent,

and should be committed to a certain school. Its judgment does not determine that the county must pay for her maintenance. The obligation of the county to pay, is derived from the language of the law itself.

8. CONSTITUTIONAL LAW—*wrongful application of a statute.* The prohibition of a county, by the constitution, to pay money to a school under the control of a church, must prevail over a statute requiring such payment; and when an attempt is made to apply a statute to a given state of facts that will give rise to a violation of such provision, the prohibition will apply the same as though the statute, on its face, were in conflict with the organic law.

9. SAME—*when constitution is self-executing.* Section 3, of article 8, of the constitution, prohibiting the appropriation, payment or gift of public moneys for any sectarian purpose, is self-executing, and applies without the aid of any legislation on the subject.

10. APPEAL—*directly to this court—in respect to the validity of a statute, or construction of the constitution.* Under section 88 of the Practice act, an appeal lies directly to this court when the validity of a statute is involved, or when the construction of the constitution is involved. A statute may be invalid from the uncertainty of its provisions, though ordinarily it is valid if it conforms to the constitution, and invalid if it does not.

11. SAME—*construction of constitution—when the question is involved.* The question of the construction of the constitution may be involved in the question of the validity of a statute. A provision of the constitution may be of such doubtful import that a statute will be in conflict with it if given one construction, and not in conflict with it if given another construction.

12. A question of the construction of a self-executing clause of the constitution will generally arise when it is applied to a given state of facts. If the meaning of a prohibition contained in such a clause is perfectly plain, there is nothing to construe; but if there is a doubt as to the meaning of any word or phrase when applied to the proven facts, then a case for construction has arisen.

13. Where a proposition presents the hypothesis that certain proven circumstances constitute a sectarian purpose, for which an appropriation or payment of public funds is sought, there is involved the construction of the word "sectarian," as used in the constitution.

14. To determine whether or not an indirect method by which money is to be taken out of the county treasury in the name of a corporation, and passed into the hands of sectarian schools, comes within the prohibition of section 3, article 8, of the constitution, involves a construction of that section as to the meaning of the words "in aid of," used therein.

APPEAL from the Circuit Court of Cook county; the Hon. RICHARD S. TUTHILL, Judge, presiding.

Mr. FRANCIS ADAMS, and Mr. E. R. BLISS, for the appellant.

Messrs. SMITH & PENCE, and Mr. G. A. KOERNER, for the appellee.

Mr. JUSTICE MAGRUDER delivered the opinion of the Court:

Under the provisions of the Act of May 28, 1879, entitled "An act to aid industrial schools for girls," and of the act to amend sections 3, 5 and 9 thereof passed on June 26, 1885, female infants to the number of about 189 were brought before the County Court of Cook County at various times between April 1, 1886, and June 4, 1887, on charges of being dependent girls. The case of each girl was submitted to a jury, who found the facts set forth in the petition to be true, and the court thereupon entered an order in the case of each of such girls, that she "be committed to the Industrial School for Girls at Chicago in said county *to be in such school kept and maintained* until she arrives at the age of eighteen years unless sooner discharged therefrom according to law." These orders were executed and the commitments were made in such manner as will hereafter appear. During the same period various certificates were issued by the judge of said County Court, certifying that certain bills for clothing, alleged to have been furnished by the Chicago Industrial School for Girls to the dependent girls so committed, were proper, and directing and authorizing the County treasurer of said county to pay the same.

This is an action of assumpsit commenced in the Circuit Court of Cook County on June 4, 1887, by the Chicago Industrial School for Girls against the County of Cook for the clothing so furnished to the said girls, and for their "tuition, maintenance and care" during the period aforesaid at the rate of $10.00 per month for each girl. The declaration contains only the common counts. The plea is the general issue with a stipulation "that the defendant may set up any defense under the plea of the general issue * * * and put in any evidence

it might under any and all special pleas well pleaded, including that of *nul tiel corporation.*"

The copy of the account sued upon shows, that, for the year from April 1, 1886, to April 1, 1887, there is claimed to be due for tuition, etc., $15664.24 and for clothing $2345.00, making a total of $18,009.24, which, being reduced by a credit of $2109.16, leaves $15,900.08 as the amount alleged to be due on April 1, 1887. Other bills were offered in evidence for "tuition, maintenance and care" for the period from April 1, 1887, to June 3, 1887, inclusive, making "the total of all bills for tuition, maintenance and clothing" $19,583.00. A jury was waived by agreement and the cause was tried before one of the Judges of the Circuit Court, who rendered judgment in favor of the plaintiff for $19,583.00, from which this appeal is prosecuted.

The Board of Commissioners of Cook County declined to pay these bills when presented, on the ground that they were forbidden to do so by Section 3 of Article 8 of the Constitution of this State, which reads as follows: "Neither the General Assembly, nor any county, city, town, township, school district, or other public corporation, shall ever make any appropriation, or pay from any public fund whatever, anything in aid of any church or sectarian purpose, or to help support or sustain any school, academy, seminary, college, university, or other literary or scientific institution controlled by any church or sectarian denomination whatever; nor shall any grant, or donation of land, money, or other personal property, ever be made by the State, or any such public corporation, to any church, or for any sectarian purpose."

It is claimed on the part of the County of Cook, the appellant herein, that the appellee, the Chicago Industrial School for Girls, never had any existence except on paper; that it never owned or leased any building or conducted any such school as was contemplated by its charter and by the Act of May 28, 1879; that the corporation known as the "Chicago

Industrial School for Girls" was a mere tender to two institutions called respectively the House of the Good Shepherd and the St. Joseph's Orphan Asylum; that all the commitments nominally made to appellee were as matter of fact made to these institutions; that appellee never furnished any of the clothing nor performed any of the services, for which suit is brought, but that the girls, under the warrants for their commitment, were placed at once under the charge and care of these two institutions, and were taught, maintained and clothed by them alone; that they alone have received all the money heretofore paid nominally to appellee by the county of Cook, and that they alone are to receive all the money that may be recovered in this suit; that the name of appellee is, in other words, nothing more than another name for these two institutions; that the House of the Good Shepherd and the St. Joseph's Orphan Asylum are Roman Catholic Schools under the control of the Roman Catholic Church; that, by paying the bills sued for, the County will be paying money out of the public funds in aid of a church or sectarian purpose and to help support and sustain schools controlled by a church or sectarian denomination.

Upon the trial in the court below a stipulation was made between counsel as to some of the facts, and testimony was also introduced, on the one side to sustain, and on the other to controvert the claim thus made by the county.

As bearing upon the questions suggested by the evidence, the defendant below submitted to the trial judge certain written propositions of law, as provided for by section 41 of the Practice Act. His refusal to hold as law the propositions so submitted, and also his refusal to admit certain testimony offered by the defendant, are assigned as errors.

The first question to be passed upon is, whether or not the payment of these bills by the appellant will be a violation of the provision of the constitution above quoted. The refused propositions hold the affirmative of this question, and, in order

35 —125 ILL.

to determine whether they are erroneous or not, it will be necessary to see what the evidence, upon which they are based, tends to prove.

*First,* are the House of the Good Shepherd and the St. Joseph's Orphan Asylum schools controlled by a church or sectarian denomination, or do they have in view and exist for the accomplishment of sectarian purposes?

Upon this subject counsel for appellee, in their brief, use the following language: "The stipulation, which has been referred to, shows, * * * that the House of the Good Shepherd is an incorporated body under the special act of March 7, 1867, and owns the land on which its building stands; that St. Joseph's Orphan Asylum is also incorporated; that *those institutions are respectively under the control of orders of sisters of the Roman Catholic Church.*"

The record of the incorporation of the Orphan Asylum appears to have been lost. The charter of the House of the Good Shepherd approved March 7, 1867, after reciting that the Sisters of the Good Shepherd in Chicago "are members of an order the object of which is to reform abandoned women" etc., enacts, that Adeline Noreau (known as Sister Mary of the Nativity) superior; Mary Kavanaugh (known as Sister Mary of St. Philomene) assistant; Catherine Riordan (known as Sister Mary of St. Joseph) counsellor; and Clara Nonenkamp (known as Sister Mary of the Visitation) counsellor, and their successors, etc., are constituted a body corporate by the name of "The House of the Good Shepherd;" and, by that name, shall have the right to carry on an institution at Chicago for the reformation of abandoned women; "to make such laws, rules and regulations as may be necessary for the proper order, conduct and control of said house; * * * to *keep a school or academy,* or engage in any other lawful * * * business for the purpose of maintaining said house."

The stipulation of counsel, which sets forth the admitted facts in the case, contains the following recitals:

"That the House of the Good Shepherd has been maintained since its organization, and is now, for the purposes of its incorporation as defined by the act aforesaid. That the Sisters of the Good Shepherd named in said act of March 7, 1867, and their successors in office, belong to one of the several orders of the Roman Catholic Church, under the general denomination of nuns.

"That upon their admission to said order they assumed certain vows, by which they are pledged to belief in the tenets and doctrines of the Roman Catholic Church, to the absolute exclusion of all other religious creeds, and also to yield implicit obedience to the mandates of the superior authorities of said order.

"That the management and control of said St. Joseph's Orphan Asylum is vested in another order of said church, known as the Sisters of Charity, whose relations to said church are similar to those of the Sisters of the Good Shepherd, and that since its organization said institution has been used for the purposes of its incorporation, viz., as an asylum for orphans.

"That both of said institutions are in the possession of and under the absolute control and management of said two orders respectively."

Murray Nelson, a witness for the defendant, testifies, that he was a member of the Board of Commissioners of Cook County from December 1886 to December 1887 and was chairman of the finance committee, and that he spent a day in the House of the Good Shepherd. He says: "There is no secret about the religious or sectarian character of the House of the Good Shepherd. The institution is a Roman Catholic institution on the face of it. * * * Everything indicated that it was a Roman Catholic institution. All the paraphernalia of the church—pictures, graven images, candles, crucifixes, crosses—were met at every quarter, in every passage way, in *the school room*, on the desks, on the walls, everywhere."

Frederick H. Wines, another witness for defendant, testifies, that he is Secretary of the State Board of Public Charities, and, as such, visited the two institutions in question, and that he was in both of them "long enough to go all over them." He says : "Mary Cleary and Johanna Williams unquestionably had the charge or management of the House of the Good Shepherd. The lady, who took me around, was the lady Superior, who was in command of everything and everbody in the place, and respected as such. Everybody rose when she came into the room. * * * Mary Cleary was the Superior, and Johanna Williams—it seems to me it is Sister Mary of the Nativity they call it. Did you ascertain anything upon your visits there as to whether or not the institution known as the House of the Good Shepherd was controlled by any church or sect? It is controlled by a religious order of the church. Of what church? The Roman Catholic Church."

Thomas Brennan, a witness for plaintiff, testifies as follows : "What, if any, particular creed is taught in the House of the Good Shepherd? Catholic. * * * I am asking you * * * whether or not all the inmates are instructed in the Roman Catholic creed? No, there are some of them not instructed at all, because they do not oblige those that are not of their faith to receive instructions of that kind nor require them to."

From the testimony of this witness it appears, that the only creed taught is the Catholic creed. Those, who may not be obliged to receive instruction in the Catholic faith, are not instructed in any faith. No provision is made for instruction in such creeds, other than the Catholic, as may be preferred by any of the inmates.

It is admitted, that the "Chicago Industrial School for Girls carries on all its operations through these institutions." The record shows the order of exercises, which children of a certain class, who have been committed to the Industrial School but are taught and cared for in the House of the Good Shepherd and The St. Joseph's Orphan Asylum, are required to observe

on each day.    Among these exercises, in the morning, are "Morning prayers—5.30 to 6.00—Chapel exercises—6.00 to 6.45—School—8.00 to 12.00," and, in the evening, "Night prayers—8.20 to 8.40." As no other than the Roman Catholic religion is taught, the prayers and chapel exercises here referred to must be those prescribed by the Catholic Church.

That the institutions now under consideration conduct *schools* for the instruction of the children committed to their care is not only apparent from what has been said and from other circumstances disclosed by the evidence, but also from the very nature of the services, for which this suit is brought. Nearly all the money claimed to be due is for *tuition*, care and maintenance. The work of tuition was all performed by these institutions, as will be seen hereafter. The meaning of the word "tuition," as here used, is "instruction" or "the act or business of teaching the various branches of learning."

It follows from the foregoing statement of the evidence, that The House of the Good Shepherd and The St. Joseph's Orphan Asylum are "schools controlled by a church." Being such they are necessarily sectarian in their character and in their objects. One of the definitions given by Webster of sectarianism is "adherence to a separate religious denomination."

In *State of Nevada* v. *Hallock* 16 Nev. 373, it was held that the Nevada Orphan Asylum was a sectarian institution, and that the payment of a claim made by it against the State would be a violation of the following provision in the State Constitution: "No public funds of any kind or character whatever, state, county, or municipal, shall be used for sectarian purposes." The facts in that case will be found, on examination, to be similar to the facts in the case at bar. The Court there use the following language: "It is admitted * * * that the St. Mary's School is a part or branch of the Nevada Orphan Asylum; that it is controlled exclusively by officers of the latter, who are Sisters of Charity, members of the Roman Catholic Church, and who can not become sisters unless they

are members of that church. The petitioner is a branch of the "mother house" at Emmetsburg, Maryland, and has to report to it;" (then follows a review of the testimony). "From all the preceding facts it seems to us  *  *  *  that the Nevada Orphan Asylum is a sectarian institution. * * * A religious sect is a body or number of persons united in tenets, but constituting a distinct organization or party, by holding sentiments or doctrines different from those of other sects or people. In the sense intended in the constitution, every sect of that character is sectarian, and all members thereof are sectarians. * * * Counsel * * * lay great stress upon what are claimed to be the facts; that is to say, that Protestant children are taught only those things which are common to all Christian people, and that only the children of Catholic parents are taught the principles of the Catholic Church. In the first place, the facts are not so, and, in the second place, *if they were, the instruction given to the Catholic children would stamp the institution as sectarian.* The facts are, that all exercises of a religious nature are of one kind, exercises appertaining to the Catholic Church, and they are regular, and form as much a part of the daily routine, as does the study of geography or arithmetic. * * * It does not matter that Catholic parents desire their children taught the Catholic doctrines, or that Protestants desire theirs to be instructed in Protestantism. * * * *It is what is taught, not who are instructed,* that must determine this question. If the instruction is of a sectarian character, the school is sectarian. * * * It was intended, *that public funds should not be used,* directly or *indirectly,* for the building up of any sect. And any instruction or exercises, which, in common schools, would be of sectarian character, are so at the St. Mary's School."

In this connection it may be proper to notice one of the errors assigned on the ground of the exclusion of evidence. Defendant, for the purpose of showing that the Chicago Industrial School itself was controlled by the Catholic Church,

offered to prove, that one of the Judges of the Superior Court of Cook County went to the House of the Good Shepherd and was refused admittance, and was told that, "if he wished to be admitted, he must get a permit from the Roman Catholic Bishop or some gentleman member of the Catholic church in good standing."

As we understand the record, counsel for the plaintiff below admitted the truth of the statement, that the occurrence, which it was thus proposed to prove, actually took place, but objected to it "as immaterial." The objection was sustained and defendant excepted. We think this ruling was erroneous. It is admitted that the Chicago Industrial School, if it had any existence at all except on paper, was carried on in the buildings and upon the premises of the two institutions already named. The amendatory Act of June 26, 1885, provides, that the petition to inquire into the dependency of a female infant may be presented to the County Court "*or any court of record of said county.*" Therefore, a judge of the Superior Court had the power, under the law, to commit dependent girls to this Industrial School when proper application should be made to his court. Moreover, Section 6 of the Act of May 28, 1879, provides, that a duplicate copy of the warrant, under which each girl is committed, and of the indorsements thereon including the matron's receipt for the girl committed, shall "be recorded by her in a book kept for that purpose and said book shall *always be open to the inspection of any person.*" Hence, the refusal to admit a judge of the Superior Court into the place where the Industrial School was alleged to be carried on and where the book, containing copies of the warrants of commitment to it, were required to be kept, unless he should first obtain a permit from a bishop or member of the Catholic church, was a strong circumstance tending to show that the school in question was controlled by a church.

*Second,* will the payment of the bills sued for "help support or sustain" the House of the Good Shepherd and the St. Joseph's

Orphan Asylum, or be in aid of their sectarian purposes? In other words, is the Chicago Industrial School merely another name for these two institutions?

The Chicago Industrial School for Girls was incorporated in November 1885 under the act, entitled "An act concerning Corporations" approved April 18, 1872, and, on November 24, 1885, obtained the written consent of the Governor to avail itself of the provisions of the above mentioned act of May 28, 1879, and of the amendments thereto. By the third section of its charter its management was vested in a board of nine directors to be elected annually, and, by the fourth section, the following persons were selected as directors for the first year: Mary Cleary, Johanna Williams, Mary Kavanaugh, Margaret Cantwell, Anna Joice, Mary Morrisey, Johanna Brenan, Addie Williams and Mary D. Jones. These same persons are also named in the charter as incorporators.

By the stipulation aforesaid, which is dated January 30, 1888, it is admitted, that Mary Cleary, Johanna Williams, Mary Kavanaugh, Margaret Cantwell, Anna Joice, Mary Morrisey and Johanna Brenan "were before and on the 24th day of November, 1885, and are now members of said order of the Sisters of the Good Shepherd, and that, as members of such order, they perform certain duties in the matter of the care and custody of the inmates of the said House of the Good Shepherd in discipline and in moral, *religious* and manual *training*." Addie Williams and Mary D. Jones were communicants of the Roman Catholic Church, but not connected with either of the orders mentioned. By an amendment of the by-laws passed on November 28, 1886, it was provided that the incorporate charter members should remain directors for life.

It thus appears that, of the nine persons, who were directors and incorporators of the Chicago Industrial School for Girls, seven were officers and managers of the House of the Good Shepherd and continued so to be thereafter.

At a meeting of the charter members of the Chicago Industrial School for Girls held on November 28, 1885, at which the Archbishop of the Roman Catholic Church was elected chairman and stated the object of the meeting to be "the election of officers in order to perfect the organization," Mary Cleary was elected President, Anna Joice Vice-President, Johanna Williams Recording secretary, and Mary Kavanaugh, Treasurer. Mary Cleary was the Mother Superior of the House of the Good Shepherd, Johanna Williams its Matron and Secretary, Anna Joice and Mary Kavanaugh among its subordinate officers, and the latter one of its original incorporators in 1867.

It thus appears that the officers of the House of the Good Shepherd were made officers of the Chicago Industrial School for girls.

The meeting of November 28, 1885, at which the officers of the Industrial School were elected, was held in the parlors of the House of the Good Shepherd in the presence of its representatives and of representatives from St. Joseph's Orphan Asylum. The witness Thomas Brennan, who was also present at the meeting, testifies :

"There was a general conversation then as regards the organization of the Industrial School for Girls, and it was discussed in various ways and manners how it should be conducted, but for the time being it was decided that the House of the Good Shepherd and the Orphan Asylum should receive those girls from the Industrial School for Girls, and take care of them until such time as a proper building was erected."

Nothing further was done or said in relation to the erection of a building until May 28, 1887, a few days before this suit was begun and after the County had refused to pay some of the bills presented, when a motion was made and seconded, at a meeting of the directors, for the selection of a building "for the domiciling of the children of the school." The meeting adjourned "with the understanding that the members should

meet at an early day to perfect plans to collect money for the erection of a future home for the children of the school."

As matter of fact, however, up to the date of the commencement of this suit the Chicago Industrial School for Girls has neither owned nor leased nor contracted for a building, nor has it owned or acquired any property of any kind.

Brennan further says: "The idea I got from the conversation then was, that those children, when committed by the court, were to be sent to these institutions, and they were to receive them and take care of them for the Industrial School. * * * *The Industrial School girls are divided between the House of the Good Shepherd and the St. Joseph's Orphan Asylum;* do not know how they are classified, or whether any distinction is made between them; * * * there is very little distinction made in taking care of the Chicago Industrial School children and the others. The treatment they receive is about the same. There are about 350 inmates of the House of Good Shepherd; there are some who are called abandoned and others who are not; they have separate play grounds and separate class-rooms. Do I understand you to say that the inmates of the House of the Good Shepherd proper are kept separate from the Chicago Industrial School children? No, Sir; he did not ask me that question; the children are classified; *each class may contain children of both institutions.*"

The following is another portion of Brennan's evidence: "Where is the Chicago Industrial School for Girls and where does the President reside? The children are kept in the House of the Good Shepherd. Where is the Chicago Industrial School for Girls? I answered that by telling you where they are kept. You say that you kept the children in the House of the Good Shepherd and the St. Joseph's Orphan Asylum? Yes Sir. I am now asking you *where the Chicago Industrial School for Girls is?* I suppose, as far as that is concerned, *it is there in those two institutions.* Anywhere else that you know of? Not that I know of. Then the President of the Chicago Industrial School

presides over its destinies at the House of the Good Shepherd? Yes Sir. * * * She was connected with the House of the Good Shepherd prior to the organization of the Industrial School. * * * She had general management of the House of the Good Shepherd. What are her duties there now? I think about the same. You are acquainted with the recording secretary of the Chicago Industrial School, are you not? Yes Sir. * * * She was associated with the other sisters in the management of the House of the Good Shepherd prior to the organization of the Chicago Industrial School. I think she was in charge of certain classes or assistant probably in charge of certain classes. What is the nature of her duties there now? I think about the same."

The witness Nelson says: "I deemed it necessary to find the Industrial School and went on a mission in that direction, first being told that it was at the House of the Good Shepherd and the St. Joseph's Orphan Asylum; I went to the House of the Good Shepherd and spent a day looking for the Industrial School, and *finding no such school there* I objected to the payment of the bills. * * * I am clear in my recollection of that fact that *I failed to find the Industrial School.* * * * I made a great many inquiries of the officers and persons in charge of the House of the Good Shepherd as regards the Industrial School; I found nothing to indicate which were the children of the Industrial School; they were *mixed with the children of the House of the Good Shepherd* in different departments."

The witness Wines says: "The Mother Superior volunteered the remark, that none of the children committed by the County Court were in the department for Magdalens; all the other inmates were in the other two departments and *I do not think there was any distinction made;* I saw nothing that indicated it."

Between December 11, 1885, and April 1, 1886, the sum of $2604.34 was claimed to be due to the Chicago Industrial School for Girls from the County of Cook for tuition, etc., and

clothing, which are admitted on the face of the bills to have been furnished entirely by the two Catholic Institutions. The County paid the amount in the spring and summer of 1886. Johanna Williams acknowledged its receipt. $290.00 were paid for attorneys' fees. Of the remaining $2314.34, $1035.36 were paid to the St. Joseph's Orphan Asylum and $1278.98 to the House of the Good Shepherd.

In the record of the proceedings of the Chicago Industrial School for Girls, the Secretary sets forth itemized bills of amounts claimed to be due, on account of tuition, clothing, etc., of girls committed to the School, for the quarterly periods succeeding April 1, 1886. As to amount due on July 1, 1886, the entry is as follows:

"The bill which amounts to $3449.64 is to be divided as follows:

"Srs. of St. Joseph ...................... $1757.33
"Srs. of the Good Shepherd ............... 1692.31

"Total ......................... $3449.64"

All the other bills are made out in the same way. The total of the amounts to be paid out of each bill to the House of the Good Shepherd and the St. Joseph's Orphan Asylum, and to the attorney, who looks after the commitments, equals, in every case, the amount of the bill presented to the county. The Industrial School as such gets nothing.

In the stipulation of counsel as to facts it is admitted, "that *said moneys* so received by the House of the Good Shepherd and St. Joseph's Orphan Asylum," (the $2314.34 above named), "*were by such institutions respectively mingled with and used with other funds* belonging to them, and under the direction of the managing officers or persons in control thereof."

In the stipulation it is furthermore admitted, that the girls committed by the County Court from April 1, 1886, to June 4, 1887, and for whose tuition and clothing this suit is brought,

"*were,* for the times charged respectively, *in either the building belonging to the House of the Good Shepherd or that belonging to St. Joseph's Orphan Asylum, and were supported and clothed by those institutions* respectively, together with all the other inmates thereof, *out of the funds of said institutions of which the moneys paid by the county were a portion and to which funds the moneys to be received in this suit are to be contributed.*"

It is further admitted that about seventy three girls, who were committed to the Chicago Industrial School for Girls by the County Court, were already in the House of the Good Shepherd and the St. Joseph's Orphan Asylum at the times of such commitments.  In other words, being already inmates of those institutions they were taken to the County Court and adjudged to be dependent girls and at once returned to those institutions, and thereafter the County was charged with $10.00 per month for the tuition of each of them, and $15.00 or $20.00 or $25.00 for clothing for each of them.  We so understand the following clause in the stipulation:  "That at the times of committal of the following named girls,—that is to say, Katie Boyle, (and seventy-two others whose names appear on stipulation,)—by the county court to the Chicago Industrial School, they had been and were under the charge of the House of the Good Shepherd, or St. Joseph's Orphan Asylum, having been received into one of those institutions prior to the times of such committal to the Chicago Industrial School for Girls."  It is also shown by the evidence that 19 other girls, who had been fined by Police Justices and sent to the House of the Good Shepherd on account of such fines, were declared dependent by the County Court under the Industrial School Act and returned to the House of the Good Shepherd under the commitments provided for in that Act. That is to say, being already in that institution by reason of the fines imposed upon them, they were recommitted to its walls because adjudged to be dependent girls.

From this review of the evidence we are forced to the conclusion that the payment by the County of the money sought to be recovered in this suit will be a payment in support of schools controlled by a church and in aid of a sectarian purpose. Even if this conclusion be too broadly stated, there is still another view, which brings the facts of the case within the terms of section 3. That section forbids any payment "in aid of any church." The two institutions in question are admitted to be under the control of two orders of the Roman Catholic Church. As we understand it, these orders are a part of the machinery of that church. Therefore, what is paid to aid them is paid in aid of a church.

The same conclusion follows from an examination of the Act of May 28, 1879, and an application of its various provisions to the peculiar circumstances of this case.

.The Chicago Industrial School for Girls, as it appears in the record before us, is not such an institution as is entitled to avail itself of those provisions. It has never established, maintained or carried on an industrial school for girls as contemplated by the first section of the act. It has never provided a home and proper training school for the girls committed to its charge, as required by the second section. It was not the intention of the act, that the duties required of the schools therein mentioned should be performed by other institutions not organized as industrial schools. Its design was that each industrial school should maintain a home of its own and superintend the training of its own scholars. The eleventh section is the only one, which has reference to the care of any of the girls by outside parties. That section provides for placing an inmate in the home of a good citizen, or for her adoption by a person of good character, or for binding her to a reputable person as an apprentice or a servant, subject to the right of the "officers and trustees" of the school to see that she is properly treated, and to take her back into their own custody in case of her ill treatment. The specification in this way of a

particular mode for placing the inmates under the control of outside parties excludes the idea that it was the intention of the act to permit any other mode.

The schools therein named have no power to relinquish the care and guardianship, which they are themselves required to exercise, or to intrust to others the instruction and training, which they are themselves required to give. The word, "provide," as used in the act, does not mean that the education of the pupils can be surrendered to another corporation, but that the industrial school shall adopt all proper means for accomplishing the object of its organization under the direction of its own officers and upon premises in its own control. This sufficiently appears from the language of the act.

The fourth section provides for the entry of an order by the Judge, "that such infant be committed to an industrial school, etc., * * * to be in such school kept and maintained." These words imply that the school must be a place and must be carried on in a building. It is not sufficient that it have a charter and a formal organization. A person can not be kept and maintained in a mere corporation, which has no *situs*— no habitation—which is nothing more than a mere corporate entity. The appellee never had a building, in which such infants could be kept and maintained. They were kept and maintained in the two institutions already mentioned.

By the sixth section, the warrant directs the person, designated for that purpose by the judge, to take the dependent girl "and *convey her* to the . . . . . . . Industrial School for Girls," etc. In the case at bar the warrants gave directions to *convey* to the Chicago Industrial School for Girls. There was no such school. The girls were conveyed to the House and Asylum aforesaid. The seventh section provides that "upon receiving the dependent girl the matron of the school shall endorse upon the warrant" a receipt for the girl named therein. The receipts upon the warrants in this case are signed: "Johanna Williams, Matron." The proof shows, that this lady was the matron and

secretary of the House of the Good Shepherd. The records of the proceedings of the Chicago Industrial School for Girls do not show, that she was elected to any other position in the latter corporation than that of recording secretary. In the stipulation, however, she is spoken of, in another connection, as "the recording secretary and matron of the plaintiff."

The 8th section prescribes "the fees for *conveying* a dependent girl to an industrial school for girls." The 9th makes it the duty of the Judge to see that every girl committed "shall, at the time *she is conveyed to the school*, be furnished" with certain clothing. The 14th provides for the same visitation, inspection and supervision by the Board of State Commissioners of Public Charities "as the charitable and penal institutions of the State." Such commissioners are required to inquire and examine into "the condition of the buildings, grounds and other property connected therewith." (Hurd's Rev. Stat. 1885 page 200). All these expressions, and others that might be mentioned, show the meaning of the law to be, that these industrial schools must be conducted in buildings or on premises in their own possession and under their own control.

The 10th section of the act requires that "the officers and trustees of any industrial school for girls in this State shall receive into such school all girls committed thereto under the provisions of this Act and shall have the *exclusive custody, care and guardianship* of such girls." Such custody, care and guardianship can not be exclusive if they are confided to another corporation, or exercised in conjunction with another corporation. In the present case the girls committed to the Chicago Industrial School for Girls were not only taken to the House and Asylum above mentioned, but were mingled with the other inmates of those institutions and placed in the same classes with them, except that the abandoned girls were kept separate from the rest. By the 10th section, also, the officers and trustees of the industrial school, and no other persons,

are required to provide for the support and comfort of their inmates, and "to instruct them in such branches of useful knowledge as may be suited," etc., and to prescribe the tasks necessary for "their education and training." These are duties which can not. be delegated under the terms of the act in question. The corporations charged with their performance are supposed to be peculiarly fitted therefor. It is for this reason that only those corporations, which obtain the consent of the Governor, can avail themselves of the provisions of the Act.

Even if the Chicago Industrial School for Girls had the power to make a contract with the two institutions in question for taking care of the dependent girls and furnishing them with a home and with instruction and training and with necessary clothing, yet there is nothing in the record to show that there was any such contract either express or implied. On the contrary the Chicago Industrial School for Girls merely stood for those institutions and was nothing more than another name for them. Its officers were their officers. Its premises were their premises. Its training was their training. If money was paid to it, such money went to them. If girls were committed to it, such girls were taken to their buildings. If there was a receipt for a girl committed to it, or for clothing furnished by it, such receipt was signed by their matron. There are in the record about 122 bills for clothing furnished, made out against the County of Cook in the name of the Chicago Industrial School for Girls, each for the articles of clothing mentioned in section 9 of the Industrial School Act, and each signed by "Johanna Williams, Matron." Each bears a date later by a month or more than the date of the commitment therein mentioned. Some of the bills are for $15.00 each, some for $20.00 each and some for $25.00 each. Each has attached to it a certificate of the County Judge, certifying "that the above bill of expense for clothing *furnished by the Chicago Industrial School for Girls* to . . . . . . . . . a dependent girl under . . . . . . years of age, committed to said school, is

proper, and the County Treasurer of said County is hereby directed and authorized to pay the same." And yet it is admitted in the stipulation above quoted, that the 122 girls, whose names appear in these bills, "were supported and *clothed* by those institutions," that is to say, by the House of the Good Shepherd and the St. Joseph's Orphan Asylum. It otherwise appears in the record that all the clothing specified in these bills was furnished by those two institutions.

We are, therefore, of the opinion, that the trial Judge erred in refusing to hold as law the written propositions, which maintain, that, under the facts of this case, the payment of the money sued for would be a violation of section 3 of article 8 of the constitution. A constitutional mandate can not be circumvented by indirect methods. Under our form of government church and state are not and never can be united. The former must pursue its mission without aid from the latter.

It is recorded in the national constitution that "Congress shall make no law respecting an establishment of religion." An eminent law writer says: "Those things, which are not lawful under any of the American constitutions, may be stated thus: * * * 2. Compulsory support, by taxation or other- wise, of religious instruction. Not only is no one denomina- tion to be favored at the expense of the rest, but all support of religious instruction must be entirely voluntary." (Cooley's Const. Lim. (5th Ed.) page 580). The women, whose names are written in this record, are animated by the purest motives. They are engaged in the best and holiest of all works, that of reforming the wicked and caring for the unfortunate. We agree with counsel for appellee that they do their work faith- fully and well. It is so shown by the proofs. But it is none the less true that, by the command of the constitution, no county "shall ever * * * pay, from any public fund what- ever, anything * * * to help support or sustain any school * * * controlled by any church." It is not for us to dis- cuss the wisdom or unwisdom of this prohibition. There it is,

couched in terms so emphatic that it can not fail to challenge attention. Any scheme, even though hallowed by the blessing of the church, that surges against the will of the people as crystallized into their organic law, must break in pieces, as breaks the foam of the sea against the rock on the shore.

It is objected, however, that the defense set up by the county in the case at bar can not be made in an action of this kind. The objection is, that the appellee was a corporation *de facto;* that the dependent girls were committed to it; that, as a result of such commitments, they were taught, cared for and clothed; that a corporate body *de facto* can not, in the language of counsel, "have its organization questioned collaterally in an action of this character, and that, if its organization is defective, or if it fails to comply with its charter requirements, writs of *quo warranto or scire facias* may be directed against it to prevent its further action." We do not think the objection is well taken.

The county is required to make payment, for the tuition, etc., of dependent girls, "to the industrial school for girls *to which they may be committed.*" It is not bound to pay an industrial school to which they are *not* committed. It is not sufficient that the County Judge *orders* them to be committed. They must be actually taken to the school and placed within its building. Has not the County Board the right to inquire whether the girls have been committed to such a school or not? The board is required to pay $10.00 per month for each girl "upon the proper officer *rendering proper accounts therefor quarterly.*" Has not the Board the power, in order to determine whether the accounts are "proper" or not, to examine and see whether tuition has been furnished for the number of months mentioned in the accounts? The order of the judge directs that the girl shall be "kept and maintained" in the school until she is 18 years old, "unless sooner discharged," etc. The Board can certainly inquire into the condition of affairs to ascertain whether or not the girl has been kept and

maintained, as ordered by the court, and how long she was so kept and maintained before her discharge.

If the Board, upon examination, finds that the girls have never been taken to any industrial school for girls, but that they have been taken to and kept and maintained in two institutions, that are not industrial schools for girls, and to whose care and keeping no industrial school for girls has any power to transfer them, then it becomes a serious question whether there is any authority for allowing the accounts rendered and ordering them paid out of the county treasury. The proceeding is statutory and the statute must be strictly adhered to.   The case is not one of an ordinary debt due to an ordinary corporation.   The statute itself defines the debt to be paid, and who is to pay it, and to whom it is to be paid.

But independently of these considerations, the defense of the county does not rest altogether upon the want of power in the appellee to turn over the performance of its duties to two sectarian institutions, but upon the want of power in appellant to pay money to those institutions.   It is not contended by the county, that the *organization* of appellee was defective; on the contrary, it seems, upon the face of the papers, to have been organized in strict conformity to the statutory requirements.   The constitution forbids the county to pay; the defense is grounded more upon this constitutional prohibition as controlling the action of the *defendant* in the suit, than upon such want of power or abuse of power as affects the position of the *plaintiff* in the suit.

If the views already, expressed are correct, a payment of this money by the county will be a violation of the constitution.   Will there be any less a violation of the constitution, because hereafter a *quo warranto* proceeding is instituted against appellee resulting in an ouster from all its franchises?   Suppose that a corporation organized for a lawful purpose maintains and operates a gambling institution, and brings suit upon a note payable to its own order and given to it for a

lawful debt.    The maker of the note can not defend, on the ground that the plaintiff is perverting its powers by running a gambling establishment.    That matter must be inquired into by the writ of *quo warranto* or *scire facias*.    But if the note in question had been given for a gambling debt, that fact could be set up as a defense, because the statute makes such a note absolutely void; and the defense would be none the less good because there was also a proper case for a *quo warranto* proceeding on account of the abuse or misuse of corporate powers.

So, if an industrial school, that has availed itself of the provisions of the act, is guilty of the misuse or non-use of its powers, and brings suit against a county upon a contract which the latter *can lawfully make*, perhaps a defense can not be maintained solely upon the ground that the school is violating its charter; the proper proceeding to test that question may be *quo warranto*.    But if the contract sued upon is a contract by a county to pay money out of the public funds in aid of a sectarian purpose, it is absolutely void, as the constitutional prohibition against *paying* money is equally a prohibition against a *contract* to pay money.    Can it be doubted that the void character of such a contract can be set up as a defense to the suit, notwithstanding the fact, that good grounds may also exist for a *quo warranto* proceeding?    If, in the case at bar, there is any contract, express, or implied, or arising out of the provisions of the act of May 28, 1879, between Cook County and these two sectarian institutions operating under appellee's name, then such contract is void, because the consideration, on which it is based, is forbidden by the constitution as being against public policy.    But is there any contract with the county to pay the money sued for in this action?

The act of May 28, 1879, provides that, upon petition filed, a jury may be called to determine whether a female infant is a dependent girl, and if there is a verdict that she is, the county judge may order her to be committed to an Industrial School for Girls, etc.    But the act nowhere provides that the

county may appear in the proceeding, nor does it seem to contemplate that the county has any right to appear. The judgments of commitment in this record recite that the County of Cook was present by its attorney. But the presence of a county attorney is not shown anywhere in the record except by these recitals in the judgments.

Section 9 as amended says that "for the tuition, maintenance and care of dependent girls the county from which they are sent shall pay to the industrial school for girls, to which they may be committed, for each dependent girl under 18 years of age, the sum of $10.00 per month. And upon the proper officer rendering proper accounts therefor quarterly, the county board shall allow and order the same paid out of the county treasury." As the county is not allowed to appear in the proceedings to commit the dependent girls, it has no opportunity to contest these bills for tuition except in suits brought for their collection. The adjudication of the county court involves no other question than that the girl is dependent and should be committed to a certain school. The judgment of that court does not determine that the county must pay. The obligation of the county to pay is derived from the language of the law itself.

If, on the one side, a statute directs the county board to pay money to a school, which appears, not on the face of the statute, but from outside proof, to be controlled by a church, and, if on the other side, the constitution, in a self executing provision, directs the county board not to pay money to such a school, which direction is to be followed? We answer unhesitatingly, the latter. When the constitution says: "you must not pay," it must be obeyed in preference to a statute which says: "you must pay." And this is true not only where the statute on its face is in conflict with the constitutional provision, but also in a case where an attempt to apply the statute to a given state of facts gives rise to a violation of such provision. We are, therefore, of the opinion that, upon the

facts of this case, the Act of May 28, 1879, imposes no obligation upon the county of Cook which is superior to its obligation to obey section 3 of article 8 of the constitution.

The second question presented for our consideration relates to the jurisdiction of this court, and arises upon a motion made by the appellee to dismiss the appeal for want of jurisdiction, which motion was reserved until the hearing of the cause.

The 88th section of the Practice Act provides, that "appeals from and writs of error *to circuit* courts etc.    *    *    *    in all *    *    *    cases in which a franchise or freehold or the validity of a statute or *construction of the Constitution* is involved * * * shall be taken directly to the Supreme Court."

An appeal may lie to this court where the validity of a statute is involved, and an appeal may also lie where the construction of the constitution is involved. A statute may be invalid from the uncertainty of its provisions, but ordinarily it is valid if it conforms to the constitution and invalid if it does not conform to the constitution. It is manifest that the construction of the constitution may be involved in the question of the validity of a statute. A provision of the constitution may be of such doubtful import that a statute would be in conflict with it, if given one construction, and not in conflict with it, if given another construction.

The question of the construction of a constitutional provision usually arises out of a comparison of such provision with the terms of a statute supposed to be in conflict with it. But there are constitutional provisions, which are self-executing and require no legislation to make them effectual. (*East St. Louis* v. *People ex rel. Gundlach* 124 Ill. 655). Section 3 of article 8 as above quoted is one of those prohibitory clauses, which execute themselves. (*Law* v. *People* 87 Ill. 385). It is clear that a question of the construction of such a self-executing clause will generally arise when it is applied to a given state of facts. If the meaning of the prohibition contained in such a clause is perfectly plain, there is nothing to construe. But

if there is a doubt as to the meaning of any word or phrase when applied to the proven facts, then a case for construction has arisen.

One of the propositions refused by the court below attempts to define what is a "sectarian purpose" as those words are used in section 3 of article 8. It collates certain facts as above narrated, and then states, that, if the Court finds these facts to be established by the evidence, "then the court finds as a matter of law that the payment of the account claimed would be in aid of a sectarian purpose" etc. One state of facts might reveal a sectarian purpose and another state of facts might not reveal a sectarian purpose. When a proposition presents the hypothesis that certain proven circumstances constitute and make up a sectarian purpose, then there is involved a construction of the word "sectarian" as used in the constitution.

This precise point was considered in *State of Nevada* v. *Hallock, supra.* In regard to the provision of the Nevada constitution, which has already been set forth, the court in that case say: "The amendment to the constitution above quoted was intended to be self acting. It requires no legislation to become operative. * * * The object of construction, as applied to a written constitution, is to give effect to the intent of the people in adopting it. * * * In this case there is, in one sense, no ambiguity. It is plain that no public funds can be used for sectarian purposes; but it is not plain, from the amendment itself, what the people meant by the words 'sectarian purposes.'" The learned Chief Justice then proceeds to examine the legislation of the state, and the facts of the case in hand, to determine the meaning of the words.

Another proposition refused by the trial court presents the question whether section 3 of article 8 shall be construed to mean, that the county shall not pay anything *directly* to the school controlled by a church, or whether it shall be construed to mean also that such payment must not be made *indirectly*

to another corporation for the benefit of the school so controlled by a church. To determine whether or not the indirect method already explained, by which money is to be taken out of the county treasury in the name of the Chicago Industrial School for Girls and passed over to the House of the Good Shepherd and the St. Joseph's Orphan Asylum, comes within the prohibition of section 3, involves an interpretation of the meaning of that section, and, by consequence, a construction of the constitution.

But the refused propositions also present a definition of what is meant in section 3 by a payment "in aid." It is strenuously contended by counsel that Section 3 was only intended to prohibit gifts or donations, and that it refers to "State support, gifts by way of aid," and "appropriations to be used by managers of religious institutions without restraint or liability to account." The theory seems to be, that, even if the two institutions *are* controlled by a church and *are* to be the recipients of all the money paid to appellee, yet neither they nor their purposes are aided by such payment, provided only there is a consideration for the money paid. It is said, that these institutions furnish tuition and clothing in return for the money received by them, and that, as they earn what they get and are not the recipients of any gift or donation, nothing is paid in their "aid" "or to help support or sustain" them. The refused propositions assert the contrary of the view thus contended for. The determination of their correctness or incorrectness requires an interpretation of the language of section 3, and, therefore, necessarily involves a "construction of the constitution."

The second clause of section 3 provides, that no grant or *donation* of land, money or other personal property shall ever be made to any church or for any sectarian purpose by the State, that is, the General Assembly, or any such public corporation, that is, any county, city, town, township or school district etc. The first clause says that neither the State nor

any such public corporation shall ever make any appropriation or pay from any public fund whatever anything in aid of any church or sectarian purpose. Evidently the second clause was intended to prohibit something different from the first clause. The second prohibits grants and donations, the first, appropriations and payments "in aid." If the appropriations and payments mentioned in the first clause mean simply "donations" and nothing more, then it was surplusage to add the second clause to the section. Upon the plainest principles of construction, the first clause has reference to a different kind of aid from that to be derived from donations. Its language is comprehensive enough to embrace all appropriations and payments whether based on a consideration or not.

It can not be said that a contribution is no aid to an institution because such contribution is made in return for services rendered or work done. A school is aided by the patronage of its pupils even if they do pay for their tuition. Because the customers of a merchant pay for their goods, it is none the less true that his business is aided by their custom. The act under discussion is entitled "An act to *aid* industrial schools for girls." If the payment by the county of $10.00 per month on account of each dependent girl committed to such a school is no aid to the school simply because "tuition, maintenance and care" are furnished in return for such payment, then the act is not properly entitled.

The doctrine here contended for is an exceedingly dangerous one. In *County of McLean* v. *Humphreys*, 104 Ill. 378, it is intimated by this Court, that the State is under obligations to protect and educate such classes of female infants as were declared to be dependent girls by section 3 of the act of May 28, 1879, as that section stood before it was amended on June 26, 1885. Under this view, the industrial schools, which teach and care for such girls, are performing, as substitutes for the state, a duty which the state itself is bound to perform. If they are entitled to be paid out of the public funds even though they are

under the control of sectarian denominations simply because they relieve the State of a burden, which it would otherwise be itself required to bear, then there is nothing to prevent all public education from becoming subjected, by hasty and unwise legislation, to sectarian influences. By section 1 of article 8 of the constitution it is made the duty of the State to provide a thorough and efficient system of free schools. If statutes are passed, under which the management of these schools shall get into the hands of sectarian institutions, then, under the theory contended for, the prohibition of the constitution will be power-less to prevent the money of the tax-payers from being used to support such institutions inasmuch as they will render a service to the state by performing for it its duty of educating the children of the people. It is an untenable position, that public funds may be paid out to help support sectarian schools provided only such schools shall render a *quid pro quo* for the payments made to them. The constitution declares against the use of public funds to aid sectarian schools independently of the question whether there is or is not a consideration fur-nished in return for the funds so used.

There is nothing in the doctrine here announced which con-flicts with the case of *Millard* v. *Board of Education,* 121 Ill. 297. There the proceeding was by an individual tax-payer against a Board of Education, and a majority of the Court sustained the act of the Board, which had no school-house, in temporarily leasing the basement of a Catholic Church for the purpose of holding one of the public schools therein. But the Board did not part with its control of the school. The scholars were taught by teachers, whom the Board appointed, and under a system of instruction, which the Board prescribed.

Nor do the reasons here given for sustaining the jurisdiction of the Court in this case conflict with the other case of *Millard* v. *Board of Education,* 116 Ill. 23. There the opinion expressly states, that no question of the validity of a statute or of the construction of the constitution was raised. But here the ques-

tion of the proper construction of a constitutional provision is directly raised upon the face of the record.

For the reasons thus stated the motion to dismiss the appeal for want of jurisdiction is overruled.

Counsel for appellant has called our attention to the changes made in section 3 of the Act of May 28, 1879, by the amendments to that section passed in June 1885. By the latter, every female infant shall be considered a dependent girl, who shall have no permanent place of abode, or who shall not have proper parental care or guardianship, or who shall not have sufficient means of subsistence, and, if the parent or guardian of the girl is fit to have the custody of her, the petition is only required to state that "the father, mother or guardian *consents* to the girl being found dependent." These are, indeed, extraordinary provisions. They are not found in the original act. They seem almost to lay the foundation for the establishment of paternal government. They appear to open the way for many parents to escape their obligations to support their children. If the counties are compelled to take care of all the children, whose support may be forced upon them under these broad provisions, there is danger that taxation will ere long become so burdensome as to amount almost to the confiscation of the property of the tax-payer.

But upon the question as to whether these provisions are constitutional or not, the argument of counsel is not full enough to sufficiently advise us, and we have no time at present to make original investigations. We, therefore, pass no opinion upon their constitutionality.

The judgment of the circuit court is reversed.

*Judgment reversed.*