[No. 975.]

## THE STATE OF NEVADA ex rel. KEYSER & ELROD, Relators, v. J. F. HALLCCK, STATE CONTROLLER, Respondent.

Act to Establish State Asylum Unconstitutional.—The act entitled "An act to establish and maintain a state asylum for the indigent poor and maimed of this state" (stat. 1879, 142), is in plain conflict with section 3, art. 13, of the constitution.

Idem—Repeal of Statutes.—When the provisions of an unconstitutional act attempt to repeal a former statute: *Held*, that the repealing clause falls with the act.

Application for mandamus.

The facts appear in the opinion.

*R. H. Taylor* and *H. R. Whitehill*, for Relators.

I.　The act approved March 17, 1879, is constitutional. (Secs. 1, 3, Art. XIII; Sec. 2, Art. XVII., of Con.; *Devlin* v. *Coleman*, 50 N. Y. 531; *Exline* v. *Smith*, 5 Cal. 112.)

II.　The constitution must be so construed as to give effect to all of its provisions. (*State* v. *Scott*, 9 Ark. (4 Eng.) 277, 282; *State* v. *Dayton T. R. Co.*, 10 Nev. 160.)

III.　The contemplated asylum is an institution required by the public good. The legislative *dictum* upon that subject shuts out all debate. The court must look to the words of the instrument, and say *ita lex scripta est*.) *People* v. *Morrell*, 21 Wend. 584; *State* v. *Scott*, 9 Ark. 276; 1 Story on Constitution, sec. 425; *Holman Heirs* v. *B. of Norfolk*, 12 Ala., E. S. 418; *Maize* v. *State*, 4 Ind. 344; *Com.* v. *McWilliams*, 11 Penn. St. (1 J.) 70; *Bourland* v. *Hildreth*, 26 Cal. 180; *Stock. & V. R. R. Co.* v. *Stockton*, 41 Id. 158.)

IV.　All presumptions are in favor of the validity of legislative enactments. (*State* v. *Brennan's Liquors*, 25 Conn. 288; *Hartford Br. Co.* v. *Union Ferry Co.*, 29 Id. 227; *Maize* v. *State*, 4 Ind. 344; *Brown* v. *Buzan*, 24 Id. 196; *Groesch* v. *State*, 42 Id. 547; *Lucas* v. *Commissioners Tip. Co.*, 44 Id. 530; *Taylor* v. *Flint*, 35 Ga. 124; *Armstrong* v. *Jones*, 34 Id. 309; *Adam* v. *Howe*, 14 Mass. 340; *Ex parte McCollom*, 1 Cowen, 564; *Clark* v. *People*, 26 Wend. 605; *Newell* v. *People*, 7

N. Y. 109; *Lane* v. *Dorman,* 3 Scam. 240; *Emerick* v. *Harris,* 1
Binn. 416; *Com.* v. *Smith,* 4 Id. 123; *Com.* v. *McWilliams,*
11 Penn. St. 70; *Farmer and Mec. Bank* v. *Smith,* 3 Serg. & R.
73; *Fletcher* v. *Peck,* 6 Cranch 128; *Gibbons* v. *Ogden,* 9
Wheat. 187: *Hobart* v. *Sup. Butte Co.,* 17 Cal. 30; *Stock. &*
*Vis. R. R. Co.* v. *Stockton,* 41 Id. 159; *Ash* v. *Parkinson,* 5
Nev. 35.)

V. When an act of the legislature is assailed as uncon-
stitutional, the objector assumes the burden of showing
either that it is an exercise of authority not legislative in its
nature, or that it is inconsistent with some provision of the
federal or state constitution. (*Dorman* v. *State,* 34 Ala.
N. S. 231; *Hobart* v. *Supervisors,* 17 Cal. 30; *Cohen* v.
*Wright,* 22 Id. 308; *Bourland* v. *Hildreth,* 26 Id. 183.)

The following authorities are also referred to as bearing
upon the different points made for relators. (*Roosevelt* v.
*Goddard,* 52 Barb. 533; *People* v. *Bennett,* 54 Barb. 480;
*McComber* v. *New York,* 17 Abb. Pr. 35; *Settle* v. *Van Evrea,*
49 N. Y. 280; *Buckingham* v. *Davis,* 9 Md. 328; *Manly*
v. *State,* 7 Md. 147; *Ex parte McCollom,* 1 Cowen, 564; *Ken-*
*dall* v. *Kingston,* 5 Mass. 532; *Tyler* v. *People,* 8 Mich. 320;
*Tabor* v. *Cook,* 15 Id. 322.)

*M. A. Murphy, Attorney General,* for Respondent:

I. It was the intention of the constitution that the law
should be so framed that the unfortunates should be pro-
vided for within the counties where they resided, in order
to meet the requirements of that class of unfortunates men-
tioned in sec. 3 of art. XIII. of our constitution. (Sec. 3749
*et seq.* C. L. Nev., vol. 2.)

II. The words *shall provide,* used in sec. 3 of art. XIII., are
mandatory. (Sedgwick on C. & S., 317, note Cons. Pro.;
Id. 375, "may and shall."

III. The act is unconstitutional, because it is in con-
flict with section 8 of the declaration of rights. (Cooley on
Cons. Lim. 339; *In the matter of James,* 30 How. Pr. Rep.
446; 65 Me. 120.)

IV. The county commissioners are the creatures of the
statutes, and are possessed of no power to deprive a person

of his liberty; neither can the legislature confer upon a county physician and chairman of the board of county commissioners judicial powers to deprive a person of his liberty without due process of law.  (65 Maine, 120.)

V. If there is a doubt in the minds of the judges, the written constitution should have the benefit of the doubt. (Cooley on Cons. Lim. 73; *People* v. *Lynch,* 51 Cal. 25.)

VI. As to conflict between different sections, the whole instrument to be examined. (Cooley's Cons. Lim. 57–59.)

VII. Section 3 of article XIII. in express terms makes it obligatory upon the counties to support the class therein named within the territorial limits of each county. The presumption is that the people designed that it should be exercised in that mode only. (Cooley's Con. Lim. 78.)

By the Court, BEATTY, C. J.:

This is a petition for a writ of mandamus to compel the respondent, who is state controller, to draw his warrant in favor of the petitioners for the amount of a duly allowed claim on the fund created by an act of the last legislature, approved March 17, 1879, and entitled "an act to establish and maintain a state asylum for the indigent poor and maimed of this State."

The case has been submitted upon demurrer to the petition and upon a stipulation as to the facts which present but one question for decision, and that is as to the constitutionality of the act referred to. If the act is held valid the writ is to issue, if not the proceeding is to be dismissed.

Respondent does not question the correctness of petitioners' proposition that "when an act of the legislature is assailed as unconstitutional the objector assumes the burden of showing either that it is an exercise of authority not legislative in its nature, or that it is inconsistent with some provision of the federal or state constitutions." He admits also that all presumptions are in favor of legislative enactments, and that the act in question must stand unless, as he undertakes to show, it is in plain and palpable conflict with section 3 of article

XIII. of the state constitution, which reads as follows: "Section 3. The respective counties of the state shall provide, as may be prescribed by law, for those inhabitants who by reason of age and infirmity or misfortunes may have claim upon the sympathy and aid of society."

The nature of the act under which petitioners claim is very clearly indicated by its title. It creates a state asylum for paupers, and repeals the law under which hitherto the respective counties of the state have been compelled to relieve their own poor. The trustees of the state asylum are required to receive and support any person who is certified by the chairman of the board of county commissioners and the county physician to be a *bona fide* resident of their county, and from the infirmities of age or other sufficient cause, unable to support himself, and without the means of support. (Sec. 7.) This is the substance of the act, and its scope and operation are manifest. It deprives respective counties of the means of providing for their own poor, and transfers all the paupers in the state to one establishment, where they are to be maintained at the charge of the whole people. The repugnance of such provisions to the policy declared in the section of the constitution above quoted is too obvious to require comment, for the meaning of that section, whether read by itself or in connection with other sections which are supposed by counsel for petitioners to control or modify it, is perfectly clear. "Those inhabitants who, by reason of age, etc., may have claim upon the sympathy and aid of society" is merely an euphemism for "paupers," and to "provide for" paupers is to feed and clothe and house them. This is what the people in framing our constitution have said that the respective counties shall do, and this is exactly what the legislature has undertaken to say the state shall and the counties shall not do. This being so, there can be no doubt that the act is void. It is true that the constitution does not expressly inhibit the power which the legislature has assumed to exercise, but an express inhibition is not necessary. The affirmation of a distinct

policy upon any specific point in a state constitution implies the negation of any power in the legislature to establish a different policy.  "Every positive direction contains an implication against anything contrary to it which would frustrate or disappoint the purpose of that provision.  The frame of the government, the grant of legislative power itself, the organization of the executive authority, the erection of the principal courts of justice, create implied limitations upon the law-making authority as strong as though a negative was expressed in each instance." *(People* v. *Draper,* 15 N. Y. 544.)  The presumption is always that the positive provisions of a constitution are mandatory and not merely directory (Cooley's Con. Lim. 78, 79), and there is nothing to overthrow this presumption with respect to the provisions under discussion.  On the contrary it is strongly supported by the consideration that section 3 of article 13 of our constitution simply engrafts upon our fundamental law a policy with respect to pauperism which has prevailed in England and this country for more than three centuries—the policy of local relief for local necessities.  With the wisdom of this traditional policy we have nothing to do, and we only refer to its long prevalence as a proof, if proof were needed, that the framers of our constitution knew what they were about in adopting the section in question and meant what they have said.

But counsel for petitioner contend that section 1 of Article 13, controls or modifies the construction and operation of section 3.  Section 1 reads as follows: "Institutions for the insane, blind, and deaf and dumb, and such other benevolent institutions as the public good may require, shall be fostered and supported by the state, subject to such regulations as may be prescribed by law."

The substance of the argument on this point, if we have correctly apprehended it, is as follows: The passage of the act in question is equivalent to a solemn declaration by the legislature that a state asylum for the poor of the state is a benevolent institution which the public good requires; such declaration by the legislature is conclusive upon the

courts, therefore this is an institution which the state is enjoined by section 1 to foster and support, and consequently section 3 must receive some construction which will not defeat the legitimate operation of section 1, to which this act simply gives effect.

It is a mistake, however, to assume that the judgment of the legislature, no matter how deliberately or solemnly expressed, that a state asylum for the poor is an institution required by the public good, is conclusive upon any one, if it is true that the people have declared in the constitution that the public good requires paupers to be supported by their respective counties. And since it is clear that such a declaration has been incorporated into the fundamental law, the whole argument, based upon the conclusiveness of the legislative declaration, falls to the ground. In this view the two sections have a perfectly harmonious operation. The state is enjoined by section 1 to foster and support institutions for the public good. By section 3 it is declared that the public good requires paupers to be supported by their respective counties; the case of paupers is specifically excepted from the rule in relation to other classes of unfortunates.

There is also another view in which the two sections may be perfectly reconciled. Institutions for the insane, deaf and dumb, and blind are required by the public good in a sense wholly different from any in which asylums for paupers can be said to be for the public good. Society looks to no ulterior or contingent advantage from the support of the poor. They are supported for their own good exclusively, and simply because humanity impels us to relieve their necessities. It is different with respect to the insane, the deaf and dumb, and blind. If an insane man is restored to his reason by treatment in an asylum, there is a positive gain to the community; if he is incurable, there is a negative advantage to the public in keeping him under restraint, and so preventing him from doing mischief. The blind and deaf and dumb may be educated and trained in institutions specially adapted for the purpose into useful and

self-supporting citizens—a double advantage to the community, in making them contributors to the general good, instead of leaving them as a burden on others.  Institutions founded with these objects are, therefore, in an emphatic sense, for the public good, as contradistinguished from the good of mere objects of charity.  The state orphans' home is an instance of this sort of institution.  The object in that case is not merely to clothe and feed the orphan children—the wards of the state—but to rescue them from the dangers of neglect, to educate them and make them useful members of society, instead of exposing them to the dangers of falling into the class of depredators and malefactors.

It thus appears that there are two distinct views in which sections 1 and 3 of article 13 are perfectly harmonious; but there is no possible interpretation of the latter which will harmonize with this act.

There is still another argument of counsel to be noticed. They say the legislature undoubtedly had the power to repeal the "act relating to the support of the poor," approved November 29, 1861 (C. L., secs. 3749 to 3759), and they have done so (sec. 11 of this act).  It is the same, therefore, as if there never ·had been any act prescribing the mode by which the respective counties should provide for their poor, and they ask: "If the act of 1861 had never existed, would not the legislature have had a right under section 1 of article 13 to pass the law of 1879?' We answer unhesitating that they could not.  It would be a strange doctrine that the legislature, by neglecting to do what the constitution positively enjoins, could thereby gain the right to do what it impliedly forbids.

We wish to add in this connnection that in our opinion the act of 1861 is not repealed.  The power of the legislature to repeal a law enacted for the purpose of carrying into effect a provision of the constitution, without at the same time passing some other law to make it effective, is a question that need not be discussed.  It is sufficient for the purposes of this case to say that it cannot be presumed the legislature would have repealed the law of 1861 without

they had thought this act to be a sufficient substitute therefor; and since we are constrained to hold the principal provisions of this act unconstitutional, it follows that the repealing clauses must fall with the rest. (Cooley, Con. Lim. 178.)

The petition for mandamus is dismissed.