**132 Nev., Advance Opinion 73**

## IN THE SUPREME COURT OF THE STATE OF NEVADA

| | |
|---|---|
| DAN SCHWARTZ, IN HIS OFFICIAL CAPACITY AS TREASURER OF THE STATE OF NEVADA, Appellant, vs. HELLEN QUAN LOPEZ, INDIVIDUALLY AND ON BEHALF OF HER MINOR CHILD, C.Q.; MICHELLE GORELOW, INDIVIDUALLY AND ON BEHALF OF HER MINOR CHILDREN, A.G. AND H.G.; ELECTRA SKRYZDLEWSKI, INDIVIDUALLY AND ON BEHALF OF HER MINOR CHILD, L.M.; JENNIFER CARR, INDIVIDUALLY AND ON BEHALF OF HER MINOR CHILDREN, W.C., A.C., AND E.C.; LINDA JOHNSON, INDIVIDUALLY AND ON BEHALF OF HER MINOR CHILD, K.J.; AND SARAH SOLOMON AND BRIAN SOLOMON, INDIVIDUALLY AND ON BEHALF OF THEIR MINOR CHILDREN, D.S. AND K.S., Respondents. | No. 69611 <br><br> **FILED** <br><br> SEP 29 2016 <br><br> TRACIE K. LINDEMAN <br> CLERK OF SUPREME COURT <br> BY _____ <br> CHIEF DEPUTY CLERK |

| | |
|---|---|
| RUBY DUNCAN, AN INDIVIDUAL; RABBI MEL HECHT, AN INDIVIDUAL; HOWARD WATTS, III, AN INDIVIDUAL; LEORA OLIVAS, AN INDIVIDUAL; AND ADAM BERGER, AN INDIVIDUAL, Appellants, vs. THE STATE OF NEVADA OFFICE OF THE STATE TREASURER; THE STATE OF NEVADA DEPARTMENT OF EDUCATION; DAN SCHWARTZ, NEVADA STATE TREASURER, IN HIS | No. 70648 |

2/9/17: Corrected per letter to publishers. CJ

16-30308

OFFICIAL CAPACITY; STEVE
CANAVERO, INTERIM
SUPERINTENDENT OF PUBLIC
INSTRUCTION, IN HIS OFFICIAL
CAPACITY; AIMEE HAIRR; AURORA
ESPINOZA; ELIZABETH ROBBINS;
LARA ALLEN; JEFFREY SMITH; AND
TRINA SMITH,
Respondents.

Appeals from a district court order granting a preliminary injunction (Docket No. 69611) and from a district court order dismissing a complaint (Docket No. 70648). First Judicial District Court, Carson City; James E. Wilson, Judge (Docket No. 69611), and Eighth Judicial District Court, Clark County; Eric Johnson, Judge (Docket No. 70648).

*Affirmed in part, reversed in part, and remanded (Docket No. 69611); affirmed in part, reversed in part, and remanded (Docket No. 70648).*

Solicitor General, Ketan Bhirud, General Counsel, Joseph Tartakovsky, Adam Paul Laxalt, Attorney General, Lawrence VanDyke, Deputy Solicitor General, and Jordan T. Smith, Assistant Solicitor General, Carson City; Bancroft PLLC and Paul D. Clement, Washington, D.C., for Dan Schwartz, Steve Canavero, the Nevada Office of the Treasurer, and the Nevada Department of Education.

Wolf, Rifkin, Shapiro, Schulman & Rabkin, LLP, and Don Springmeyer, Justin C. Jones, and Bradley S. Schrager, Las Vegas; Munger, Tolles & Olson LLP and Tamerlin J. Godley, Thomas Paul Clancy, and Samuel T. Boyd, Los Angeles, California; Education Law Center and David G. Sciarra and Amanda Morgan, Newark, New Jersey, for Jennifer Carr, Michelle Gorelow, Linda Johnson, Hellen Quan Lopez, Electra Skryzdlewski, Brian Solomon, and Sarah Solomon.

American Civil Liberties Union of Nevada and Amy M. Rose, Las Vegas; Americans United for Separation of Church and State and Richard B. Katskee and Gregory M. Lipper, Washington, D.C.; American Civil Liberties Union Foundation and Daniel Mach and Heather L. Weaver, Washington, D.C.; Covington & Burling LLP and Nitin Subhedar and Samuel Jacob Edwards, San Francisco, California,
for Adam Berger, Ruby Duncan, Mel Hecht, Leora Olivas, and Howard Watts, III.

Kolesar & Leatham, Chtd., and Matthew T. Dushoff and Lisa J. Zastrow, Las Vegas; Institute for Justice and Timothy D. Keller and Keith E. Diggs, Tempe, Arizona,
for Lara Allen, Aurora Espinoza, Aimee Hairr, Elizabeth Robbins, Jeffrey Smith, and Trina Smith.

Ashcraft & Barr LLP and Jeffrey F. Barr, Las Vegas; Eric C. Rassbach, Diana M. Verm, and Lori H. Windham, Washington, D.C.,
for Amicus Curiae The Becket Fund for Religious Liberty.

Muehlbauer Law Office, Ltd., and Andrew R. Muehlbauer, Las Vegas; Wisconsin Institute for Law & Liberty and Richard M. Esenberg and CJ Szafir, Milwaukee, Wisconsin,
for Amici Curiae The American Federation for Children, Hispanics for School Choice, School Choice Wisconsin, Dr. Patrick J. Wolf, and Wisconsin Institute for Law & Liberty.

Sande Law Group and John P. Sande, IV, and Victor Salcido, Las Vegas,
for Amicus Curiae Friedman Foundation for Educational Choice.

Lemons, Grundy & Eisenberg and Robert L. Eisenberg, Reno,
for Amici Curiae National School Boards Association and Nevada Association of School Boards.

Leon Greenberg Professional Corporation and Leon M. Greenberg and Julie Underwood, Las Vegas,
for Amici Curiae Association of Wisconsin School Administrators, Horace Mann League, Network for Public Education, Wisconsin Alliance for Excellent Schools, and Wisconsin Association of School District Administrators.

SUPREME COURT
OF
NEVADA

(O) 1947A

Dyer, Lawrence, Penrose, Flaherty, Donaldson & Prunty and Francis C. Flaherty and Casey A. Gillham, Carson City; National Education Association and Kristen L. Hollar, Washington, D.C.,
for Amici Curiae National Educational Association and Nevada State Education Association.

Reisman Sorokac and Joshua H. Reisman and Heidi J. Parry Stern, Las Vegas,
for Amici Curiae Baptist Joint Committee for Religious Liberty and Hindu American Foundation.

Marquis Aurbach Coffing and Micah S. Echols, Las Vegas; Wilmer Cutler Pickering Hale and Dorr LLP and Todd Zubler, Daniel Hartman, and Kevin Gallagher, Washington, D.C.,
for Amicus Curiae Foundation for Excellence in Education.

Woodburn & Wedge and W. Chris Wicker, Reno,
for Amici Curiae Mexican-American Legal Defense and Educational Fund, Las Vegas NAACP, and Southern Poverty Law Center.

---

BEFORE THE COURT EN BANC.

## OPINION

By the Court, HARDESTY, J.:

In 2015, the Nevada Legislature passed the Education Savings Account (ESA) program, which allows public funds to be transferred from the State Distributive School Account into private education savings accounts maintained for the benefit of school-aged children to pay for private schooling, tutoring, and other non-public educational services and expenses. Two separate complaints were filed challenging the ESA program as violating several provisions of the Education Article in the Nevada Constitution. In one case, the district

SUPREME COURT
OF
NEVADA

(O) 1947A

4

court rejected all of the constitutional claims and dismissed the complaint. In the other case, the district court found that one of the constitutional challenges had merit and granted a preliminary injunction. These appeals were brought, and because they share common legal questions as to the constitutionality of the ESA program, we resolve them together in this opinion.

We are asked to decide whether the ESA program is constitutional under Nevada Constitution Article 11, Section 2 (requiring a uniform system of common schools), Section 6 (obligating the Legislature to appropriate funds to operate the public schools before any other appropriation is enacted for the biennium), and Section 10 (prohibiting the use of public funds for a sectarian purpose). We must emphasize that the merit and efficacy of the ESA program is not before us, for those considerations involve public policy choices left to the sound wisdom and discretion of our state Legislature. But it is the judiciary's role to determine the meaning of the Constitution and to uphold it against contrary legislation. Thus, the scope of our inquiry is whether the ESA program complies with these constitutional provisions.

For the reasons set forth in this opinion, we conclude that Article 11, Section 1 does not limit the Legislature's discretion to encourage other methods of education. Based on that reasoning, the ESA program is not contrary to the Legislature's duty under Article 11, Section 2 to provide for a uniform system of common schools. We also conclude that funds placed in education savings accounts under SB 302 belong to the parents and are not "public funds" subject to Article 11, Section 10.

The issue remaining relates to the funding of the education savings accounts. Based on the State Treasurer's concession that SB 302

does not operate as an appropriation bill, and that nothing in the legislative measure creating the State Distributive School Account funding for public education provides an appropriation for education savings accounts, we must conclude that the use of money that the Legislature appropriated for K-12 public education to instead fund education savings accounts undermines the constitutional mandates under Sections 2 and 6 to fund public education. Accordingly, we affirm in part and reverse in part the district court orders in both cases, and we remand each case for the entry of a final declaratory judgment and a permanent injunction enjoining the use of any money appropriated for K-12 public education in the State Distributive School Account to instead fund the education savings accounts.

I.

A.

The ESA program is contained in Senate Bill (SB) 302, passed by the Nevada Legislature in 2015. It allows grants of public funds to be transferred into private education savings accounts for Nevada school-aged children to pay for their private schooling, tutoring, and other non-public educational services and expenses. The ESA program provides financial resources for children to pay for an alternative to education in the public school system. SB 302 was passed by the Legislature on May 29, 2015, and signed into law by the governor on June 2, 2015. 2015 Nev. Stat., ch. 332, at 1824.[1]

---

[1]The provisions governing the ESA program are codified in NRS 353B.700-.930. *See* 2015 Nev. Stat., ch. 332, §§ 2-15, at 1826-31. SB 302 became effective on January 1, 2016. 2015 Nev. Stat., ch. 332, § 17(1), at 1848.

An education savings account is established when a parent enters into an agreement with the State Treasurer for the creation of the account. NRS 353B.850(1). To be eligible for an account, a child must have been enrolled in public school for 100 consecutive days immediately preceding the account's establishment. *Id.* The accounts are administered by the Treasurer and must be maintained with a financial management firm chosen by the Treasurer. NRS 353B.850(1), (2); NRS 353B.880(1). Once an account is created, the amount of money deposited into it by the Treasurer each year is equal to a percentage of the statewide average basic support guarantee per pupil: 100 percent for disabled and low-income children ($5,710 for the 2015-16 school year) and 90 percent for all other children ($5,139 for the 2015-16 school year). NRS 353B.860(2); 2015 Nev. Stat., ch. 537, § 1, at 3736. The money is deposited in quarterly installments and may be carried forward from year to year if the agreement is renewed for that student. NRS 353B.860(5), (6). An ESA agreement is valid for one school year but may be terminated early. NRS 353B.850(4). If the child's parent terminates the ESA agreement, or if the child graduates from high school or moves out of state after an account is created, unused funds revert to the State General Fund. NRS 353B.850(5); NRS 353B.860(6)(b). The statutory provisions governing the ESA program contain no limit on the number of education savings accounts that can be created and no maximum sum of money that can be utilized to fund the accounts for the biennium. NRS 353B.700-.930.

The ESA program requires participating students to receive instruction from one or more "participating entities," which include private schools, a university, a program of distance education, tutors, and parents. NRS 353B.850(1)(a); NRS 353B.900. For a private school to

qualify as a participating entity, it must be licensed or exempt from such licensing pursuant to NRS 394.211; "[e]lementary and secondary educational institutions operated by churches, religious organizations and faith-based ministries" are exempt from licensing under NRS 394.211 and thus may qualify as a participating entity. NRS 353B.900(1)(a); NRS 394.211(1)(d). The ESA funds may only be spent on authorized educational expenses, which include tuition and fees, textbooks, tutoring or teaching services, testing and assessment fees, disability services, and transportation to and from the participating entities. NRS 353B.870(1). An account may be frozen or dissolved if the Treasurer determines that there has been a substantial misuse of funds. NRS 353B.880(3).

B.

On June 1, 2015, three days after passing SB 302, the Nevada Legislature passed SB 515, an appropriations bill to fund K-12 public education for the 2015-17 biennium. SB 515 was approved by the governor on June 11, 2015. 2015 Nev. Stat., ch. 537, at 3736. In SB 515, the Legislature applied a formula-based statutory framework known as the Nevada Plan to establish the basic support guarantee for each school district, which is the amount of money each district is guaranteed to fund the operation of its schools. *Educ. Initiative PAC v. Comm. to Protect Nev. Jobs*, 129 Nev. 35, 49 n.8, 293 P.3d 874, 883 n.8 (2013); *Rogers v. Heller*, 117 Nev. 169, 174, 18 P.3d 1034, 1037 (2001) (describing the Nevada Plan). The basic support guarantee is established as a per-pupil amount for each school district, and the amount varies between districts based on the historical cost of educating a child in that district. NRS 387.122(1). The per-pupil basic support guarantee is then multiplied by the district's enrollment. NRS 387.1223(2). Once the total amount of the basic support guarantee is established for each district, the State determines how much

each school district can contribute from locally collected revenue, and the State makes up the disparity by paying to each district the difference between the basic support guarantee and the local funding. *See* NRS 387.121(1).

To fund the basic support guarantee, state revenue is deposited into the State Distributive School Account (DSA), which is located in the State General Fund. NRS 387.030. Money placed in the DSA must "be apportioned among the several school districts and charter schools of this State at the times and in the manner provided by law." NRS 387.030(2). Additional funds may be advanced if the DSA is insufficient to pay the basic support guarantee. 2015 Nev. Stat., ch. 537, § 9, at 3741. Because student enrollment may fluctuate from year to year, a "hold-harmless" provision allows a district's DSA funding to be based on enrollment from the prior year if enrollment in that particular district decreases by five percent or more from one year to the next. NRS 387.1223(3).

SB 515 sets forth the specific amounts of the per-pupil basic support guarantee for each district. 2015 Nev. Stat., ch. 537, §§ 1-2, at 3736-37. Although the amounts vary from district to district, the *average* basic support guarantee per pupil is $5,710 for FY2015-16 and $5,774 for FY2016-17. *Id.* §§ 1-2(1), at 3736. To fund the basic support guarantee for K-12 public schools, SB 515 appropriated a total of just over $2 billion from the State General Fund to the DSA for the 2015-17 biennium. *Id.* § 7, at 3740.

## C.

When an education savings account is created, the amount of money deposited by the Treasurer into an account for a child within a particular school district is deducted from that school district's

Supreme Court
OF
Nevada

(O) 1947A

9

apportionment of legislatively appropriated funds in the DSA. Specifically, Section 16 of SB 302 amended NRS 387.124(1) to provide that the apportionment of funds from the DSA to the school districts, computed on a yearly basis, equals the difference between the basic support guarantee and the local funds available[2] *minus* "all the funds deposited in education savings accounts established on behalf of children who reside in the county pursuant to NRS 353B.700 to NRS 353B.930." *See* 2015 Nev. Stat., ch. 332, § 16, at 1839-40. According to the Treasurer's estimate, over 7,000 students have applied for an education savings account so far.

## II.

### A.

The plaintiffs/respondents in *Schwartz v. Lopez*, Docket No. 69611, are seven Nevada citizens and parents of children enrolled in Nevada public schools who filed a complaint seeking a judicial declaration that SB 302 is unconstitutional and an injunction enjoining its implementation. The complaint named as the defendant State Treasurer Dan Schwartz, who is charged with enforcement and administration of the ESA program. The complaint alleged that SB 302 violates the requirement for a uniform school system under Article 11, Section 2; diverts public school funds contrary to Article 11, Section 2 and Section 6;

---

[2]To illustrate how the basic support guarantee operates by district, according to information provided in the record, Clark County had a basic support guarantee of $5,393 per pupil for FY 2014, and of that amount, $2,213 constituted the state's portion of the funding and the remaining $3,180 was paid from local funds. For the same period in Washoe County, the basic support guarantee was $5,433 per pupil, which consisted of $2,452 from state funding and $2,981 from the local funds.

and seeks a permanent injunction enjoining the State Treasurer from implementing the ESA program.[3]

The *Lopez* plaintiffs moved for a preliminary injunction, arguing that they were likely to prevail on the merits because SB 302 was clearly unconstitutional and that Nevada's public school children will suffer irreparable harm because the education savings accounts will divert substantial funds from public schools. After a hearing, the district court granted a preliminary injunction, concluding that SB 302 violated Section 6 and thus the *Lopez* plaintiffs were likely to succeed on their constitutional claim, and that the balance of potential hardship to the *Lopez* plaintiffs' children outweighed the interests of the State Treasurer and others. The district court rejected the constitutional challenge under Section 2. The Treasurer now appeals.

### B.

The plaintiffs/appellants in *Duncan v. Nevada State Treasurer*, Docket No. 70648, are five Nevada citizens who filed a complaint for injunctive and declaratory relief, asserting a constitutional challenge to SB 302 and alleging that it diverts public funds to private schools, many of which are religious, in violation of Article 11, Section 10 (prohibiting public funds from being used for sectarian purpose) and Article 11, Section 2 (requiring the Legislature to provide for a "uniform

---

[3]The *Lopez* plaintiffs also asserted a challenge under Article 11, Section 3 (requiring that certain property and proceeds pledged for educational purposes not be used for other purposes), which the district court rejected. Because the parties' appellate briefs do not develop an argument as to the Section 3 challenge, we do not address it in this opinion.

system of common schools"). The complaint named as defendants the Office of the State Treasurer of Nevada, the Nevada Department of Education, State Treasurer Dan Schwartz in his official capacity, and Interim Superintendent of Public Instruction Steve Canavero in his official capacity. Six parents who wish to register their children in the ESA program were permitted to intervene as defendants.

The State Treasurer, joined by the intervenor-parents, filed a motion to dismiss for failure to state a claim and for lack of jurisdiction. The State Treasurer argued that the *Duncan* plaintiffs lacked standing to challenge SB 302 and that the constitutional challenges were without merit. In granting the State Treasurer's motion to dismiss, the district court found that the *Duncan* plaintiffs had standing to bring facial challenges to the ESA program but that the facial challenges under Sections 2 and 10 were without merit. The *Duncan* plaintiffs appealed.

III.

As a threshold argument, the State Treasurer contends that the plaintiffs lack standing to challenge SB 302 because they cannot show that they will suffer any special injury. The question of standing concerns whether the party seeking relief has a sufficient interest in the litigation. *See Szilagyi v. Testa*, 99 Nev. 834, 838, 673 P.2d 495, 498 (1983) (citing *Harman v. City & Cty. of San Francisco*, 496 P.2d 1248, 1254 (Cal. 1972) ("'The fundamental aspect of standing is that it focuses on the party seeking to get his complaint before a . . . court'")). The primary purpose of this standing inquiry is to ensure the litigant will vigorously and effectively present his or her case against an adverse party. *See Harman*, 496 P.2d at 1254.

Generally, a party must show a personal injury and not merely a general interest that is common to all members of the public. *See, e.g., Doe v. Bryan*, 102 Nev. 523, 525-26, 728 P.2d 443, 444-45 (1986) (requiring plaintiffs, who sought to have criminal statute declared unconstitutional, to first demonstrate a personal injury, i.e., that they were arrested or threatened with prosecution under the statute); *Blanding v. City of Las Vegas*, 52 Nev. 52, 69, 280 P. 644, 648 (1929) (requiring property owner to show that he would suffer a special or peculiar injury different from that sustained by the general public in order to maintain complaint for injunctive relief).

We now recognize an exception to this injury requirement in certain cases involving issues of significant public importance. Under this public-importance exception, we may grant standing to a Nevada citizen to raise constitutional challenges to legislative expenditures or appropriations without a showing of a special or personal injury. We stress, as have other jurisdictions recognizing a similar exception to the general standing requirements, that this public-importance exception is narrow and available only if the following criteria are met. First, the case must involve an issue of significant public importance. *See, e.g., Trs. for Alaska v. State*, 736 P.2d 324, 329 (Alaska 1987). Second, the case must involve a challenge to a legislative expenditure or appropriation on the basis that it violates a specific provision of the Nevada Constitution. *See Dep't of Admin. v. Horne*, 269 So. 2d 659, 662-63 (Fla. 1972). And third, the plaintiff must be an "appropriate" party, meaning that there is no one else in a better position who will likely bring an action and that the plaintiff is capable of fully advocating his or her position in court. *See*

*Utah Chapter of Sierra Club v. Utah Air Quality Bd.*, 148 P.3d 960, 972-73 (Utah 2006); *Trs. for Alaska*, 736 P.2d at 329-30.

The plaintiffs here are citizens and taxpayers of Nevada, and most are also parents of children who attend public schools.[4] They allege that SB 302 allows millions of dollars of public funds to be diverted from public school districts to private schools, in clear violation of specific provisions in the Nevada Constitution, which will result in irreparable harm to the public school system. These cases, which raise concerns about the public funding of education, are of significant statewide importance. Public education is a priority to the citizens of this state, so much so that our Constitution was amended just ten years ago to require the Legislature to sufficiently fund public education before making any other appropriation. *See* Nev. Const. art. 11, § 6(1). The plaintiffs allege that SB 302 specifically contravenes this constitutional mandate and also violates other constitutional provisions regarding the support of public schools and the use of public funds. The plaintiffs are appropriate parties to litigate these claims. There is no one else in a better position to challenge SB 302, given that the financial officer of this state charged with implementing SB 302 has indicated his clear intent to comply with the legislation and defend it against constitutional challenge. Further, the plaintiffs have demonstrated an ability to competently and vigorously advocate their interests in court and fully litigate their claims. We conclude that, under the particular facts involved here, the plaintiffs in

---

[4]All of the *Lopez* plaintiffs have children in the Nevada public school system, and one of the *Duncan* plaintiffs has a child in public school and is also a teacher at a public school in Nevada.

SUPREME COURT
OF
NEVADA

(O) 1947A

these cases have demonstrated standing under the public-importance exception test.[5]

IV.

We now turn to the plaintiffs' constitutional claims. Initially, we note that these cases come before us in different procedural contexts—one from an order granting a preliminary injunction and the other from an order dismissing a complaint for failure to state a claim. Consequently, these proceedings would ordinarily be governed by different standards. *Compare* NRS 33.010 (injunction), *with* NRCP 12(b)(5) (motion to dismiss for failure to state a claim upon which relief can be granted). In each case, however, the district court rendered a decision as to the constitutionality of SB 302, which is purely a legal question reviewed de novo by this court. *See Hernandez v. Bennett-Haron*, 128 Nev. 580, 586, 287 P.3d 305, 310 (2012) ("[T]his court reviews de novo determinations of whether a statute is constitutional."). Thus, our review in these cases is de novo, and we apply the standards governing facial challenges to a statute's constitutionality.

In considering a constitutional challenge to a statute, we must start with the presumption in favor of constitutionality, and therefore we "will interfere only when the Constitution is clearly violated." *List v. Whisler*, 99 Nev. 133, 137, 660 P.2d 104, 106 (1983). "When making a facial challenge to a statute, the challenger generally bears the burden of demonstrating that there is no set of circumstances under which the

---

[5]Because we conclude the plaintiffs have standing under the public-importance exception, we decline to consider the parties' arguments regarding whether the plaintiffs have taxpayer standing.

statute would be valid." *Deja Vu Showgirls of Las Vegas, LLC v. Nev. Dep't of Taxation*, 130 Nev., Adv. Op. 73, 334 P.3d 392, 398 (2014). The rules of statutory construction apply when interpreting a constitutional provision. *Lorton v. Jones*, 130 Nev., Adv. Op. 8, 322 P.3d 1051, 1054 (2014). This court will look to the plain language of the provision if it is unambiguous. *See City of Sparks v. Sparks Mun. Court*, 129 Nev. 348, 359, 302 P.3d 1118, 1126 (2013). If, however, the provision is subject to more than one reasonable interpretation, the provision is ambiguous, and this court will look beyond the plain language and consider the provision's history, public policy, and reason in order to ascertain the intent of the drafters. *Id.* Our interpretation of an ambiguous provision also must take into consideration the spirit of the provision and avoid absurd results. *J.E. Dunn Nw., Inc. v. Corus Constr. Venture, LLC*, 127 Nev. 72, 79, 249 P.3d 501, 505 (2011).

## V.

The plaintiffs first argue that the ESA program violates Section 2 of Article 11 in the Nevada Constitution, which requires the Legislature to provide for "a uniform system of common schools." The plaintiffs contend that SB 302 violates Section 2 by using public funds to subsidize an alternative system of education that includes non-common, non-uniform private schools and home-based schooling, which are not subject to curriculum requirements and performance standards and which can discriminate in their admission practices. For support, the plaintiffs cite the maxim *expressio unius est exclusio alterius*, to argue that the expression in Section 2 requiring the Legislature to maintain a uniform system of common schools necessarily forbids the Legislature from simultaneously using public funding to pay for private education that is wholly outside of the public school system. *See Galloway v. Truesdell*, 83

SUPREME COURT
OF
NEVADA

(O) 1947A

16

Nev. 13, 26, 422 P.2d 237, 246 (1967) ("The affirmation of a distinct policy upon any specific point in a state constitution implies the negation of any power in the legislature to establish a different policy." (quoting *State v. Hallock*, 14 Nev. 202, 205-06 (1879))).

The State Treasurer, on the other hand, argues that the "uniform" requirement in Section 2 is concerned with maintaining uniformity within the public school system, by avoiding differences between public schools across the state, and the Legislature has fulfilled its duty by maintaining public schools that are uniform, free of charge, and open to all. The State Treasurer also asserts that Section 2 must be read in conjunction with the broader mandate of Section 1 of Article 11, requiring the Legislature to encourage education "by all suitable means," and that nothing prohibits the Legislature from promoting education outside of public schools.

A.

We begin our analysis with the text of Section 2 of Article 11, which states:

> The legislature shall provide for a uniform system of common schools, by which a school shall be established and maintained in each school district at least six months in every year, and any school district which shall allow instruction of a sectarian character therein may be deprived of its proportion of the interest of the public school fund during such neglect or infraction, and the legislature may pass such laws as will tend to secure a general attendance of the children in each school district upon said public schools.

Nev. Const. art. 11, § 2. Looking to the plain language of Section 2, it is clearly directed at maintaining uniformity *within* the public school system. *See State v. Tilford*, 1 Nev. 240, 245 (1865) (upholding under

Section 2 the Legislature's abolition of Storey County's Board of Education, which was different from any other county). Section 2 requires that a school be maintained in each school district at least six months each year, provides that funding may be withheld from any school district that allows sectarian instruction, and permits the Legislature to set parameters on attendance "in each school district upon *said public schools*." (Emphasis added.)

The plaintiffs do not dispute that Nevada's public school system is uniform, free of charge, and open to all students. SB 302 does not alter the existence or structure of the public school system. Nor does SB 302 transform private schools or its other participating entities into public schools. Indeed, NRS 353B.930 states that nothing in the provisions governing education savings accounts "shall be deemed to limit the independence or autonomy of a participating entity or to make the actions of a participating entity the actions of the State Government." Thus, SB 302 is not contrary to Section 2's mandate to provide for a uniform system of common schools.

### B.

We find additional support for this conclusion in Section 1 of Article 11, which requires the Legislature to encourage education "by all suitable means." Section 1 of Article 11 states:

> The legislature shall encourage by all suitable means the promotion of intellectual, literary, scientific, mining, mechanical, agricultural, and moral improvements, and also provide for a superintendent of public instruction and by law prescribe the manner of appointment, term of office and the duties thereof.

Nev. Const. art. 11, § 1. Use of the phrase "by all suitable means" reflects the framers' intent to confer broad discretion on the Legislature in

fulfilling its duty to promote intellectual, literary, scientific, and other such improvements, and to encourage other methods in addition to the public school system.

The plaintiffs argue that Section 1 cannot be read in isolation to permit the Legislature to take any action as long as it tends to encourage education, and that the mandate in the second clause requiring a superintendent of public instruction, as well as the debates surrounding the adoption of Article 11, show that Section 1 was meant to apply only to public education. Yet, use of the phrase "and also" to separate the superintendent clause from the suitable means clause signifies two separate legislative duties: the first *to encourage* the promotion of intellectual, literary, scientific, mining, mechanical, agricultural, and moral improvements; and the second *to provide* for a superintendent of public instruction. *See Meredith v. Pence*, 984 N.E.2d 1213, 1221 (Ind. 2013) (interpreting use of the word "and" in the Indiana constitution's education clause as setting forth two separate and distinct duties). While both clauses pertain to education, they operate independently, and the second duty is not a limitation on the first. And although the debates surrounding the enactment of Article 11 reveal that the delegates discussed the establishment of a system of public education and its funding, they also noted the importance of parental freedom over the education of their children, rejected the notion of making public school attendance compulsory, and acknowledged the need to vest the Legislature with discretion over education into the future. *See Debates & Proceedings of the Nevada State Constitutional Convention of 1864*, at 565-77 (Andrew J. Marsh off. rep., 1866); *see also* Thomas W. Stewart & Brittany Walker, *Nevada's Education Savings Accounts: A*

SUPREME COURT
OF
NEVADA

(O) 1947A

19

*Constitutional Analysis* (2016) (Nevada Supreme Court Summaries), http://scholars.law.unlv.edu/nvscs/950, at 12-15 (discussing the history of Nevada Constitution Article 11, Section 2). If, as the plaintiffs argue, the framers had intended Section 2's requirement for a uniform school system to be the *only* means by which the Legislature could promote educational advancements under Section 1, they could have expressly stated that, but instead they placed these directives in two separate sections of Article 11, neither of which references the other. To accept the narrow reading urged by the plaintiffs would mean that the public school system is the *only* means by which the Legislature could encourage education in Nevada. We decline to adopt such a limited interpretation. *See State v. Westerfield*, 23 Nev. 468, 474, 49 P. 119, 121 (1897) (authorizing expenditure of general fund money to pay a teacher's salary at a non-public school).

Our holding is consistent with the Indiana Supreme Court's decision in *Meredith v. Pence*, which upheld an education choice program against a challenge brought under the Indiana constitution's school uniformity clause similar to Nevada's. 984 N.E.2d at 1223. That case involved the state's statutory school voucher program, which permits eligible students to use public funds to attend private instead of public schools. *Id.* at 1223. The education clause at issue stated:

> [I]t shall be the duty of the General Assembly to encourage, by all suitable means, moral, intellectual, scientific, and agricultural improvement; and to provide, by law, for a general and uniform system of Common Schools, wherein tuition shall be without charge, and equally open to all.

*Id.* at 1217 n.1 (quoting Ind. Const. art. 8, § 1). Focusing in part on the use of the conjunction "and," the court interpreted this provision as plainly setting forth two separate and distinct duties—the first *to encourage*, by

all suitable means, moral, intellectual, scientific, and agricultural improvement, and the second *to provide* for a general and uniform system of common schools—and concluded that the second duty cannot be read as a restriction on the first. *Id.* at 1221, 1224. Because the public school system remained in place and available to all school children and the voucher program did not alter its structure or components, the court held that the voucher program did not conflict with the legislature's imperative to provide for a general and uniform system of common schools. *Id.* at 1223. The Indiana court instead concluded that the program fell within the legislature's independent and broader duty to encourage moral, intellectual, scientific, and agricultural improvement. *Id.* at 1224-25. The court also interpreted the phrase "by all suitable means" as demonstrating an intent to confer broad legislative discretion, and was not persuaded by the plaintiffs' argument in that case to apply the *expressio unius* canon in part because it would limit, contrary to the framers' intent, this broad delegation of legislative authority. *Id.* at 1222 & 1224 n.17.[6]

---

[6]The Supreme Courts of North Carolina and Wisconsin have likewise upheld educational choice programs against challenges under their state's uniform-school provisions. *See Hart v. State*, 774 S.E.2d 281, 289-90 (N.C. 2015) (holding that the uniformity clause applied exclusively to the public school system, mandating public schools of like kind throughout the state, and did not prevent the legislature from funding educational initiatives outside that system); *Davis v. Grover*, 480 N.W.2d 460, 473-74 (Wis. 1992) (holding that the uniformity clause requires the legislature to provide the state's school children with the opportunity to receive a free uniform basic education, and the school choice program "merely reflects a legislative desire to do more than that which is constitutionally mandated").

SUPREME COURT
OF
NEVADA

(O) 1947A

21

The plaintiffs' reliance on *Bush v. Holmes*, wherein the Florida Supreme Court held unconstitutional the state's Opportunity Scholarship Program (OSP) that permitted expenditure of public funds to allow students to attend private schools, is inapposite. 919 So. 2d 392, 407 (Fla. 2006). Florida's constitutional uniformity provision is different than Nevada's, providing:

> The education of children is a fundamental value of the people of the State of Florida. It is, therefore, a paramount duty of the state to make adequate provision for the education of all children residing within its borders. Adequate provision shall be made by law for a uniform, efficient, safe, secure, and high quality system of free public schools that allows students to obtain a high quality education . . . .

Fla. Const. art. 9, § 1(a) (West 2010). The Florida court stated that the second sentence imposed a "paramount duty" on the state to make "adequate provision" for the education of all children within the state, but the third sentence contains a restriction on the execution of that duty by requiring "a uniform, efficient, safe, secure, and high quality system of free public schools" that allows students to obtain a high quality education. *Bush*, 919 So. 2d at 406-07. The court held that the OSP violated this section by "devoting the state's resources to the education of children within [Florida] through means other than a system of free public schools." *Id.* at 407. The *Meredith* court distinguished the *Bush* decision because the Indiana Constitution contained no "adequate provision" clause and no restriction on the mandate to provide a free public school system, and instead contained two distinct duties—"to encourage . . . moral, intellectual, scientific, and agricultural improvement," and "to

SUPREME COURT
OF
NEVADA

(O) 1947A

22

provide . . . for a general and uniform system of Common Schools." *Meredith*, 984 N.E.2d at 1224.

Similarly here, the Nevada Constitution contains two distinct duties set forth in two separate sections of Article 11—one to encourage education through all suitable means (Section 1) and the other to provide for a uniform system of common schools (Section 2). We conclude that as long as the Legislature maintains a uniform public school system, open and available to all students, the constitutional mandate of Section 2 is satisfied, and the Legislature may encourage other suitable educational measures under Section 1. The legislative duty to maintain a uniform public school system is "not a ceiling but a floor upon which the legislature can build additional opportunities for school children." *Jackson v. Benson*, 578 N.W.2d 602, 628 (Wis. 1998). For these reasons, we conclude that the plaintiffs have not established that the creation of an ESA program violates Section 2.[7]

## VI.

The *Duncan* plaintiffs argue that the ESA program violates Section 10 of Article 11 in the Nevada Constitution by allowing public funds to be used for tuition at religious schools. Article 11, Section 10 of the Nevada Constitution states: "No public funds of any kind or character whatever, State, County or Municipal, shall be used for sectarian purpose." Nev. Const. art. 11, § 10.

---

[7]As for the plaintiffs' argument that SB 302's diversion of public school funding undermines the public school system in violation of Section 2, we address that issue under Section VII of this opinion.

## A.

As detailed above, the ESA program established by SB 302 allows for public funds to be deposited by the State Treasurer into an account set up by a parent on behalf of a child so that the parents may use the funds to pay for the child's educational expenses. It is undisputed that the ESA program has a secular purpose—that of education—and that the public funds which the State Treasurer deposits into the education savings accounts are intended to be used for educational, or non-sectarian, purposes. Thus, in depositing public funds into an education savings account, the State is not using the funds for a "sectarian purpose." The plaintiffs do not disagree on this point. Instead, they point to the fact that the ESA program permits parents to use the funds at religious schools, and they argue that this would constitute a use of public funds for a sectarian purpose, in violation of Section 10. We disagree. Once the public funds are deposited into an education savings account, the funds are no longer "public funds" but are instead the private funds of the individual parent who established the account. The parent decides where to spend that money for the child's education and may choose from a variety of participating entities, including religious and non-religious schools. Any decision by the parent to use the funds in his or her account to pay tuition at a religious school does not involve the use of "public funds" and thus does not implicate Section 10.

The plaintiffs contend that the mere placement of public funds into an account held in the name of a private individual does not alter the public nature of the funds. As support, the plaintiffs point to regulatory aspects of the ESA program that they claim demonstrate that the funds in the education savings accounts remain public funds under State control. For example, the accounts must be established through a financial

SUPREME COURT
OF
NEVADA

(O) 1947A

management firm chosen by the State Treasurer, the State Treasurer may audit the accounts and freeze or dissolve them if any funds are misused, and the funds revert back to the State if the child no longer participates in the ESA program or graduates from high school. NRS 353B.850(2); NRS 353B.860(6)(b); NRS 353B.880(2), (3). We recognize the ESA program imposes conditions on the parents' use of the funds in their account and also provides State oversight of the education savings accounts to ensure those conditions are met. But, as we explained earlier, the Legislature may use suitable means to encourage and promote education, see Nev. Const. art. 11, § 1, and all of the conditions imposed on the ESA funds are consistent with the Legislature's non-sectarian purpose of promoting education.[8] That the funds may be used by the parents only for authorized educational expenses does not alter the fact that the funds belong to the parents. And, though the funds may revert back to the State under certain circumstances, we nonetheless conclude that, during the time the funds are in the education savings accounts, they belong to the parents and are not "public funds" subject to Article 11, Section 10.

## B.

The plaintiffs contend that State v. Hallock, 16 Nev. 373 (1882)—the only case in which this court has addressed the meaning of

---

[8]For example, parents are restricted to using funds only on authorized educational expenses, such as tuition, fees, textbooks, curriculum, and tutoring. NRS 353B.870(1). And they must use those funds to receive instruction from "participating entities," which include private schools, public universities or community colleges, distance education providers, accredited tutoring providers, and parents that have applied for such status and met all of the requirements set forth in NRS 353B.900. NRS 353B.750; NRS 353B.850(1)(a).

Section 10—prohibits any public funds from ending up in the coffers of a religious institution or school. We disagree with the plaintiffs' reading of *Hallock*. The *Hallock* decision concerned an appropriation of public funds from the State treasury *directly* to a *sectarian institution* and held that such a payment was prohibited by Section 10. The ESA program, however, provides for public funds to be deposited *directly* into an account belonging to a *private individual*, not to a sectarian institution. No public funds are paid directly to a sectarian school or institution under the ESA program. Rather, public funds are deposited into an account established by a parent, who may then choose to spend the money at a religious school or one of the other participating entities. Those funds, once deposited into the account, are no longer public funds, and this ends the inquiry for Section 10 purposes. Our holding in *Hallock* does not require a different conclusion.[9] Accordingly, we conclude that the ESA program does not

---

[9]In support of their contention that Section 10 prohibits ESA funds from being paid to religious schools, the plaintiffs rely on a statement in *Hallock* that "public funds should not be used, directly or *indirectly*, for the building up of any sect." 16 Nev. at 387 (emphasis added). The plaintiffs read this as prohibiting any public funds from going to religious schools, whether paid directly by the State or indirectly by way of the parents. The more likely meaning of this statement was to address concern that, while public funds given to a "sectarian institution" such as the one in *Hallock*—a Catholic-run orphanage and school—may be used by that institution only to pay for the physical needs of the orphans, those funds nevertheless have the indirect effect of "building up a sect" through the instruction and indoctrination of those children in a particular sect. Regardless, the issue in *Hallock* concerned only the direct payment of public funds to a sectarian institution, and thus any statement about an indirect payment of public funds would be dictum.

Supreme Court
of
Nevada

(O) 1947A

result in any public funds being used for sectarian purpose and thus does not violate Article 11, Section 10 of the Nevada Constitution.

## VII.

Both the *Lopez* and *Duncan* plaintiffs contend that SB 302 violates Section 2 of Article 11 of the Nevada Constitution, and the *Lopez* plaintiffs assert that SB 302 violates Section 6 of Article 11 of the Nevada Constitution, which requires the Legislature to appropriate money in an amount the Legislature deems sufficient to pay for the operation of the public schools before the Legislature enacts any other appropriation for the biennium. Nev. Const. art. 11, §§ 2, 6. The plaintiffs argue that SB 302 undermines the funding of the public school system by diverting funds appropriated for public schools to the education savings accounts for private expenditures in violation of these constitutional provisions. The State Treasurer argues that Article 11, Section 2 and Section 6 impose only three requirements on the Legislature: (1) fund the public schools from the general fund; (2) appropriate funds for the public schools before any other appropriation; and (3) appropriate funds it deems to be sufficient for public schools. According to the State Treasurer, the Legislature satisfied these requirements when it passed the appropriation in SB 515 that funded the DSA, and SB 302's movement of funds from the DSA into the education savings accounts does not contravene any of these requirements.

## A.

Nevada Constitution Article 4, Section 19 states that "[n]o money shall be drawn from the treasury but in consequence of appropriations made by law." An "appropriation" is "'the setting aside from the public revenue of a certain sum of money for a specified object, in such manner that the executive officers of the government are authorized

SUPREME COURT
OF
NEVADA

(O) 1947A

to use that money, and no more, for that object, and no other.'" *Rogers v. Heller*, 117 Nev. 169, 173 n.8, 18 P.3d 1034, 1036 n.8 (2001) (quoting *Hunt v. Callaghan*, 257 P. 648, 649 (Ariz. 1927)). General legislation may contain an appropriation to fund its operation. *See State v. Eggers*, 29 Nev. 469, 475, 91 P. 819, 820 (1907). No technical words are necessary to constitute an appropriation if there is a clear legislative intent authorizing the expenditure and a maximum amount set aside for the payment of claims or at least a formula by which the amount can be determined. *See id.* at 475, 484-85, 91 P. at 820, 824; *Norcross v. Cole*, 44 Nev. 88, 93, 189 P. 877, 878 (1920). While this court has not required any particular wording to find an appropriation, there must be language manifesting a clear intent to appropriate. *See State v. Eggers*, 35 Nev. 250, 258, 128 P. 986, 988 (1913) (interpreting an appropriation act by its terms and declining to infer an expenditure when the language did not manifest such an intent).

Applying these principles, one could argue that SB 302 impliedly appropriates funds for education savings accounts because it authorizes the Treasurer to issue a grant of money for each education savings account in an amount based on a percentage of the statewide average basic support per pupil.[10] There are two problems with that argument.

---

[10]This court may raise sua sponte a constitutional issue not asserted in the district court. *See, e.g., Desert Chrysler-Plymouth, Inc. v. Chrysler Corp.*, 95 Nev. 640, 644, 600 P.2d 1189, 1191 (1979) ("[S]ince the statutes were assailed on constitutional grounds, it would be paradoxical for us to uphold the statutes on the grounds raised by the parties, yet ignore a clear violation of the separation of powers doctrine."). Although the plaintiffs

*continued on next page . . .*

First, SB 302 contains no limit on the number of education savings accounts that can be created or the maximum sum of money that can be utilized to fund the accounts for the biennium. These omissions suggest that SB 302 does not contain an appropriation. Because of the "hold-harmless" provision under NRS 387.1223(3), which allows a school district's DSA funding to be based on enrollment from the prior year if enrollment in that particular district decreases by five percent or more from one year to the next, if all students left the public school system, the State must still fund *both* the school districts' per pupil amount based on 95 percent of the prior year's enrollment *and* the education savings accounts for all students, an amount potentially double the $2 billion appropriated in SB 515 for just the public schools. Given that scenario, surely the Legislature would have specified the number of education savings accounts or set a maximum sum of money to fund those accounts if the Legislature had intended SB 302 to include an appropriation.

Second, the Legislature passed SB 302 on May 29, 2015, but it did not enact SB 515, appropriating the money to fund the public schools, until June 1, 2015. Section 6(2) of Article 11 of the Nevada Constitution

---

*. . . continued*

did not challenge the ESA program under Article 4, Section 19, they did challenge the constitutionality of SB 302's diversion to the education savings accounts of funds appropriated for the public schools in SB 515. Like in *Desert Chrysler-Plymouth*, it would be paradoxical for us to decide whether SB 302 diverts funds from the public school appropriation in SB 515, without addressing whether the education savings account funds were, in fact, appropriated in either SB 302 or SB 515. Furthermore, based on the State Treasurer's concession that SB 302 is not an appropriation, we find no need for further briefing on this issue.

Supreme Court
OF
Nevada

(O) 1947A

directs that, "before any other appropriation is enacted to fund a portion of the state budget . . . the Legislature shall enact one or more appropriations to provide the money the Legislature deems to be sufficient . . . to fund the operation of the public schools in the State for kindergarten through grade 12," while section 6(5) provides, "[a]ny appropriation of money enacted in violation of [section 6(2)] is void." If SB 302 contained an appropriation to fund the education savings accounts, it would violate Nevada Constitution Article 11, Section 6(2), requiring that before any other appropriation is enacted the Legislature shall appropriate the money to fund the operation of the public schools. Such an appropriation would be void. *See* Nev. Const. art. 11, § 6(5). For these two reasons, we necessarily conclude that SB 302 does not contain an appropriation to fund its operation. *See* Nev. Const. art. 4, § 19.

## B.

The State Treasurer therefore concedes, as he must, that SB 302 did not appropriate funds for the education savings accounts. Instead, the State Treasurer asserts that the $2 billion lump sum appropriation to the DSA in SB 515 is the total amount the Legislature deemed sufficient to fund *both* public schools and the education savings accounts. This argument fails, however, because SB 515 does not mention, let alone appropriate, any funds for the education savings accounts. The title of SB 515 states that it is an act "ensuring sufficient funding for K-12 *public education* for the 2015-2017 biennium." 2015 Nev. Stat., ch. 537, at 3736 (emphasis added). Consistent with the title's focus on public education, and the mandate in Article 11, Section 2 and Section 6, the text of SB 515 sets forth the basic support guarantee for each school district and appropriates just over $2 billion to the DSA for payment of those expenditures. The text of SB 515 does not address the ESA program or

(O) 1947A

appropriate any money to fund it. The legislative history of SB 515 contains no discussion of the education savings accounts or their fiscal impact on the amount appropriated for public schools. Moreover, the DSA Summary for the 2015-17 biennium contains a list of amounts for the basic support guarantee funding and other categorical funding components of public education, but there is no line item for funding the education savings accounts. Thus, the record is devoid of any evidence that the Legislature included an appropriation to fund the education savings accounts in the amount the Legislature itself deemed sufficient to fund K-12 public education in SB 515.[11]

The State Treasurer also argues that we must presume that the Legislature understood that SB 515 would fund both public education and the education savings accounts from the $2 billion because SB 302 had already been approved, *see City of Boulder City v. Gen. Sales Drivers*, 101 Nev. 117, 118-19, 694 P.2d 498, 500 (1985) (recognizing a presumption that when the Legislature enacts a statute it acts with full knowledge of

---

[11]The State Treasurer argues that the question of whether the Legislature appropriated funds "it deems sufficient" to fund public schools under Section 6(2) is nonjusticiable because that determination is a policy choice committed to the legislative branch. *See N. Lake Tahoe Fire Prot. Dist. v. Washoe Cty. Bd. of Cty. Comm'rs*, 129 Nev., Adv. Op. 72, 310 P.3d 583, 587 (2013) ("Under the political question doctrine, controversies are precluded from judicial review when they revolve around policy choices and value determinations constitutionally committed for resolution to the legislative and executive branches." (internal quotation marks omitted)). We do not pass judgment on whether the amount appropriated is in fact sufficient to fund the public schools. Rather, the issue before us is whether the amount the Legislature *itself* deemed sufficient in SB 515 must be safeguarded for and used by public schools and cannot be diverted for other uses under our state constitution.

existing statutes on same subject). We will not, however, infer an appropriation for a specific purpose when the legislative act does not expressly authorize the expenditure for that purpose. *See Eggers*, 35 Nev. at 258, 128 P. at 988. SB 515 does not, by its terms, set aside funds for the education savings accounts. Nor could we make such an inference. While SB 302 passed the Legislature on May 29, 2015, it was not signed into law by the governor until June 2, 2015, after the Legislature passed SB 515 on June 1, 2015. For these reasons, we reject the State Treasurer's argument that SB 515 appropriates funds for the education savings accounts created under SB 302.

## C.

Having determined that SB 515 did not appropriate any funds for the education savings accounts, the use of any money appropriated in SB 515 for K-12 public education to instead fund the education savings accounts contravenes the requirements in Article 11, Section 2 and Section 6 and must be permanently enjoined. *See* 2015 Nev. Stat., ch. 332, § 16, at 1839-41 (amending NRS 387.124(1) to require that all funds deposited in the education savings accounts be subtracted from the school districts' quarterly apportionments of the DSA). Additionally, because SB 302 does not provide an independent basis to appropriate money from the State General Fund and no other appropriation appears to exist, the education savings account program is without an appropriation to support its operation. *See* Nev. Const. art. 4, § 19. Given our conclusion, it is unnecessary to address any additional constitutional arguments under Section 6 of Article 11 of the Nevada Constitution.

## VIII.

In *Duncan v. Nevada State Treasurer*, Docket No. 70648, we affirm in part and reverse in part the district court's order dismissing the

complaint and remand the case to the district court to enter a final declaratory judgment and permanent injunction enjoining enforcement of Section 16 of SB 302 absent appropriation therefor consistent with this opinion. In *Schwartz v. Lopez*, Docket No. 69611, we affirm in part and reverse in part the district court's order granting a preliminary injunction, and we remand the case to the district court to enter a final declaratory judgment and permanent injunction enjoining enforcement of Section 16 of SB 302 consistent with this opinion.

_____, J.
Hardesty

We concur:

_____, C.J.
Parraguirre

_____, J.
Gibbons

_____, J.
Pickering

DOUGLAS, J., with whom CHERRY, J., agrees, concurring in part and dissenting in part:

I concur in all but Part VI of the court's opinion. As to Part VI, I do not believe the court should reach the issue of whether SB 302 violates Article 11, Section 10 of the Nevada Constitution for two reasons.

First, our holding that the funding of the education savings accounts must be permanently enjoined as unconstitutional makes it unnecessary for us to consider whether certain portions of SB 302 also violate Section 10. *See Cortes v. State*, 127 Nev. 505, 516, 260 P.3d 184, 192 (2011) ("Constitutional questions should not be decided except when absolutely necessary to properly dispose of the particular case." (internal quotation marks omitted)). Second, the Section 10 challenge is not ripe for a decision on the merits. In reaching the merits of the Section 10 challenge, the court ignores that the *Duncan* complaint (which raised the Section 10 challenge) was dismissed by the district court for failure to state a claim under NRCP 12(b)(5). At that stage of the litigation, the only issue to be considered is whether, accepting all factual allegations as true, the complaint alleged a claim upon which relief may be granted. *See Buzz Stew, LLC v. City of N. Las Vegas*, 124 Nev. 224, 181 P.3d 670 (2008). Because the *Duncan* plaintiffs stated a legally sufficient claim when they alleged that the ESA program violates Article 11, Section 10 by allowing public funds to be used for sectarian purpose, the district court erred in dismissing the complaint as to this claim. The court appears to concede that the plaintiffs alleged a legally sufficient claim but nevertheless would affirm on the basis that no relief is warranted because the funds in the education savings accounts are not "public" and thus do not implicate Section 10. However, in my opinion, the issue as to whether the funds in

the education savings accounts are private or public in nature involves factual determinations that were not made by the district court and should not be made by this court in the first instance. And, as the Section 10 claim is a matter of first impression and not as well-defined and easily resolved as my colleagues suggest, *see, e.g., Moses v. Skandera*, 367 P.3d 838, 849 (N.M. 2015) (holding that state constitution prohibits public funds from being used to buy textbooks for students attending private schools), *petition for cert. filed*, 84 U.S.L.W. 3657 (U.S. May 16, 2016) (No. 15-1409); *Taxpayers for Pub. Educ. v. Douglas Cty. Sch. Dist.*, 351 P.3d 461, 471 (Colo. 2015) (plurality) (holding that state constitution prohibits public funds from being given to students to use at religious schools), *petition for cert. filed*, 84 U.S.L.W. 3261 (U.S. Oct. 28, 2015) (No. 15-558), the proper action here, had a majority of this court not determined that SB 302's funding is unconstitutional, would be to remand this matter to the district court for further proceedings and factual development as to this claim. For these reasons, I respectfully dissent as to Part VI of the court's opinion.

_____ , J.
Douglas

I concur:

_____ , J.
Cherry